## COMMONWEALTH vs. DIONICIO DELVALLE.

Suffolk. January 7, 2005. - April 1, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Practice, Criminal,* Assistance of counsel, Instructions to jury, Argument by prosecutor, Reasonable doubt, Capital case. *Constitutional Law,* Assistance of counsel. *Deoxyribonucleic Acid. Evidence,* Prior misconduct, Relevancy and materiality, Expert opinion. *Intoxication.*

A criminal defendant failed to substantiate his ineffective assistance of counsel claim on either the ground that his trial counsel failed to object to scientific testimony, which testimony was clearly superfluous [789-790], or the ground that his trial counsel failed to object to testimony that the defendant had committed other crimes in the past, which testimony was properly admitted [790-791].

There was no merit to a defendant's argument that the judge at the trial of an indictment for murder in the first degree improperly allowed a medical examiner's testimony to stray beyond the scope of the autopsy report to speculate as to the cause of death and the amount of force necessary to inflict the victim's injuries, where the medical examiner's testimony rested on properly admitted evidence and was based on his own considerable experience as a pathologist. [791-792]

No likelihood of a substantial miscarriage of justice arose at the trial of an indictment for murder in the first degree from the admission in evidence of deoxyribonucleic acid testing of seven year old blood stains on items taken from the crime scene where the defendant conceded that the blood at the crime scene was his own. [792-793]

A judge at the trial of an indictment for murder in the first degree properly excluded testimony that the defendant had a serious problem with drugs at the time the murder was committed, where evidence of a general, ongoing drug problem, rather than intoxication on the night of the murder, was not relevant to any issue at trial. [793-794]

A prosecutor, in eliciting certain testimony at the trial of an indictment for murder in the first degree, did not improperly appeal to the jury's sympathy based on the race of the victim, where any potential prejudice that could have arisen from comments on the victim's race would have been offset by the judge's instructions to the jury [794]; nor was the defendant prejudiced by any error in the prosecutor's elicitation of testimony that the defendant argued might have unfairly invited the jury to draw improper conclusions from the defendant's failure to call witnesses [794-795].

Comments in a prosecutor's closing argument at the trial of an indictment for murder in the first degree did not constitute an inappropriate "right to live" argument, but rather were a fair comment on the consciousness and degree of suffering of the victim. [795-796]

The jury at the trial of an indictment for murder in the first degree could not have been misled by one sentence in the judge's instruction on reasonable doubt where the sentence, in context, was entirely consistent with the definition of reasonable doubt in *Commonwealth* v. *Webster*, 5 Cush. 295 (1850). [796]

This court discerned no reason to exercise its discretion under G. L. c. 278, § 33E, to reduce the level of a defendant's guilt from murder in the first degree to murder in the second degree, where the defendant was convicted on evidence which solidly supported findings of deliberate premeditation and of extreme atrocity or cruelty. [796-798]

INDICTMENT found and returned in the Superior Court Department on May 17, 2000.

The case was tried before *Margot Botsford*, J.

*Esther J. Horwich* for the defendant.

*Anne M. Thomas*, Assistant District Attorney (*Joshua Wall*, Assistant District Attorney, with her) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree by reasons of deliberate premeditation and extreme atrocity or cruelty. The victim was an eighty-seven year old woman who was brutally beaten and strangled during a break-in at her home. Represented by new counsel, the defendant appeals, claiming that (1) the representation provided by his trial counsel was constitutionally ineffective; (2) several evidentiary errors were made at trial; (3) three separate instances of prosecutorial misconduct occurred at trial; and (4) the jury instruction on reasonable doubt was defective. The defendant also asserts that the Commonwealth presented insufficient evidence to warrant a jury finding of premeditation or of extreme atrocity or cruelty. He requests, therefore, that we reduce his conviction to murder in the second degree pursuant to our authority under G. L. c. 278, § 33E. We affirm the conviction and decline to reduce the verdict or to order a new trial.

We summarize the evidence before the jury. The eighty-seven year old victim, Maude Hinds, lived by herself in the second-floor apartment of a three-story house she owned at 56 Clifford Street in the Roxbury section of Boston. Born in Barbados, she came to the United States when she was sixteen years of age, married and divorced, and raised a son who predeceased her.

Although of advancing years, she was a relatively active individual who liked to garden and to dance. She maintained close family ties and had many friends at the church she regularly attended and in her neighborhood.

At approximately 9 P.M. on April 22, 1991, the tenant of the first-floor apartment at 56 Clifford Street, Idelfonso Martinez, discovered the victim's lifeless body lying in the first-floor common hallway of the house. She wore a floral blouse, a black skirt, and a green jacket. Near her body lay shoes, a cap, a broken flashlight, and a hammer. All of her clothes, as well as the items found near her body, were stained with blood. The victim's second-floor bedroom had been ransacked.

Police officers called to the scene discovered that a window leading to a room in Martinez's apartment had been broken and was smeared with blood. Clear fingerprint impressions were found on the broken glass, as well as on both sides of the molding of the inside window frame. Initial testing of the blood stains found on the victim's clothing revealed the presence of type O blood (the victim had type O blood) and the presence of type A blood. Type A blood was also found on the broken window. Copies of the fingerprints were submitted to the State police but no match was found in that database. Polymerase chain reaction (PCR) testing conducted in 1998 on the samples of blood that were taken from the victim's blouse, skirt, jacket, and from the broken window frame (and frozen for the interim seven years) revealed the existence of two distinctly different deoxyribonucleic acid (DNA) profiles. The DNA from the blouse and skirt was an identical match to DNA taken from the victim. That found on the green jacket and the window frame was from another individual, whose identity was unknown. For nine years, investigators had no suspects in the case.

On March 11, 2000, the Boston police department acquired a computerized fingerprint filing and identification system known as the Automated Fingerprint Identification System (AFIS). That same day, a fingerprint expert for the Boston police department, Officer Dennis LeBlanc, entered images of the fingerprints taken from the crime scene at 56 Clifford Street into the AFIS database. Within two hours, Officer LeBlanc had identified the defendant as the source of the fingerprints.

At about 8:45 A.M. on April 28, 2000, four detectives from the Boston police department and a probation officer from the Boston Municipal Court went to the defendant's home at 21A San Juan Street. When the defendant answered the door, the officers informed him that he was going to be arrested on an outstanding default warrant issued by the Boston Municipal Court for possession of cocaine. The officers waited while the defendant helped his two young daughters get ready for school. The probation officer then walked the children to school. The defendant made two telephone calls to his wife. He was then arrested and placed in an unmarked police vehicle, where he was given, and indicated his understanding of, his Miranda rights.

At the police station, the defendant was brought to the homicide unit. At that point the defendant (who apparently had noticed a sign indicating that he was entering the homicide unit) asked what was going on and was told that all would be explained in due time. The defendant's manner was cordial. At 9:20 A.M., the detectives again advised him of his Miranda rights. Before signing the line indicating his agreement to make a statement without a lawyer, the defendant demanded to know what was going on. He then was informed that he was being charged with murder.

The defendant's initial response was to volunteer that, although he had done a "lot of b and e's," he had never killed or stabbed anyone. The defendant then agreed to sign the printed Miranda form and made the following statement. The defendant had in the past been a frequent visitor to Martinez's first-floor apartment and often bought "dope" from Martinez. He had been present at 56 Clifford Street one time when someone had attempted to break in and had once fixed a rear window.[1] The defendant knew the victim and had helped carry her groceries. The defendant stated to the police that he had not been at 56 Clifford Street on the day the victim was murdered, but that he always had believed Martinez was responsible for her death.

When confronted with the fact that his bloody fingerprints had been found on the broken window and frame on the day

---

[1] The defendant's description of the type of window he had fixed (one operated by rope pulleys) did not accurately describe the type on which his fingerprints were found.

after her murder, the defendant told the police that he had broken the window while he and his brother had attempted to break into Martinez's apartment while "fending" for drugs. The defendant admitted to cutting his hand and showed the officers the resulting scar. Because a steel grate on the window prevented his entry, the defendant stated, he used a screwdriver to "jimmy" the back door of the house, and he and his brother entered the back common hallway.

The defendant then described to the detectives three variations of events that occurred next. First, the defendant stated that, as he entered the hallway, he heard a noise coming from the second floor, and he turned and ran, leaving his brother in the hallway. Next, the defendant told the detectives that, as he was in the hallway, he saw a figure of a person (whom the defendant thought was Martinez) coming down the back stairs before he fled. Finally, when questioned about the presence of the same blood on the victim's jacket as on the broken window, the defendant admitted to the police that he may have brushed by the victim to make his escape. The defendant stated, "I may have touched her but I never killed her."

The defendant also offered alternative explanations of how he first learned of the murder. The defendant stated: (1) his brother, Roberto (who had since died from AIDS) had made a deathbed confession to the defendant that he (Roberto) had killed the victim; (2) a friend had mentioned to him that something had happened at 56 Clifford Street; and (3) he had watched news of the murder on television. The defendant told the officers that, at the time, he suspected that his brother had committed the murder but that he would not "rat [his brother] out."[2]

The Commonwealth presented compelling evidence at trial that the fingerprints on the broken window and the blood on the victim's green jacket belonged to the defendant. Sergeant Robert J. Silva, the supervisor of the latent fingerprint section of the Boston police department, testified extensively in connection with the fingerprint evidence and identified eleven of the fourteen fingerprints found on the window and window frame

---

[2]The interview concluded when the defendant declined to allow the police to tape record his statement and requested an attorney.

as belonging to the defendant.[3] Joseph Varlaro, a senior criminalist with the Boston police crime laboratory's DNA unit, testified that the DNA contained in the blood stain on the victim's green jacket and the blood samples collected from the broken window was an identical match to DNA in a sample of the defendant's blood that was submitted to the laboratory after the defendant's arrest. Varlaro testified that this particular DNA profile could be expected to be found in approximately one in every 50,000,000 African-Americans, one in every 13,000,000 Caucasians, and one in every 270,000 Southwestern Hispanics (including people of Mexican or Native American descent).[4]

The medical examiner who had performed the autopsy of the victim in 1991 was no longer employed by the Commonwealth at the time of the defendant's trial in 2002. The chief medical examiner for the Commonwealth, Dr. Richard John Evans, testified as to the injuries sustained by the victim and the cause of death, based on his review of the case folder maintained by the medical examiner's office, the autopsy report, the diagrams in that report, and the photographs admitted in evidence. Dr. Evans testified the victim was four feet, eleven inches tall and weighted approximately 130 pounds. Externally, she suffered (1) hemorrhages to the whites and the conjunctiva of her eyes; (2) bruises and abrasions to her head; (3) an abrasion to her nose and a bloody nose; (4) bruising to her mouth; (5) abrasions to her neck and jaw; (6) swelling of her face; and (7) bruising to her chest and left knee. Internally, the victim suffered (1) hemorrhaging under the skin in the muscles of her neck; (2) a gaping fracture of the twelfth thoracic vertebra;[5] (3) three rib fractures on the right; (4) two rib fractures on the left; (5) hemorrhaging

---

[3]Sergeant Silva testified that the defendant's name was at the top of a list of ten potential matches generated by the AFIS for the submitted fingerprint sample. After his initial verification that the defendant's fingerprints closely matched those taken from the crime scene, no investigation was conducted of the other candidates on the list.

[4]Varlaro testified that, in determining the rarity of any given DNA profile, his lab relies on data obtained from the Federal Bureau of Investigation (FBI). According to Varlaro, the FBI does not maintain DNA profile statistics on Southeastern Hispanics (including people of Dominican, Cuban, and Puerto Rican descent).

[5]The medical examiner testified that the chest area in which the fractured vertebra was located showed some signs of arthritis.

in the muscles of her chest underneath the external bruising; (6) a deep hemorrhage in the muscle over her right side extending to her back; and (7) swelling in her lungs. Dr. Evans testified that the victim's injuries were inflicted within a short time of each other.

Dr. Evans concluded, to a reasonable degree of medical certainty, that the victim died of manual strangulation and blunt chest trauma, either of which independently could have caused her death. He testified that, in his opinion, a large degree of force is necessary to split a spine and to rip the intercostal muscles as occurred here. He compared the force necessary to inflict the victim's injuries to severe motor vehicle accidents where "a car going sixty miles an hour hits a brick wall or hits a tree." He added, "I've also seen it come when people jump out of a four-story window and hit the pavement." Over objection, he opined that the injuries to the victim's spine and ribs could have been caused by "stomping" and explained that "a large amount of force is necessary to snap the spine even in an eighty-seven year old lady with some arthritis." He testified that there was no evidence that a weapon such as a hammer was used to inflict these injuries.

The defense theory presented was that the defendant had gone to the victim's home with his brother intending to break into Martinez's first-floor apartment to steal drugs, but that the defendant had run away when surprised by the victim, and it was the defendant's brother, Roberto, who had murdered her.[6] The defendant's trial counsel acknowledged to the jury that there was sufficient evidence to warrant a verdict of felony-murder in the second degree but strenuously argued that the Commonwealth had not proved beyond a reasonable doubt that the defendant had the requisite intent for murder in the first degree.

Further details of the trial will be discussed in connection

[6]The defendant's sister, Idalia DeJesus-Dubai, testified that Roberto had awakened one night shortly before he died, saying, "I killed her, I killed the old lady." On cross-examination, however, she admitted telling the police that she was not certain that Roberto had confessed to the killing because Roberto had been heavily medicated and had spoken "gibberish." She also admitted telling the police that the first she had heard about a connection between Roberto and the murder was from the defendant after his arrest.

with relevant issues as they arise. We now consider the merits of the defendant's claims.

1. *Ineffective assistance of counsel claim.* Because the defendant has been convicted of murder, we examine his claim that his trial counsel furnished him with constitutionally ineffective representation to determine whether there was an error in the course of the trial by defense counsel, and, if there was, whether that error was likely to have influenced the jury's conclusion. See *Commonwealth* v. *Frank,* 433 Mass. 185, 187-188 (2001); *Commonwealth* v. *Plant,* 417 Mass. 704, 715 (1994).

The defendant advances his claim of ineffective assistance on two grounds. First, he asserts that his trial counsel erred in failing to object to Varlaro's testimony regarding the probability of a DNA match among African-Americans, Caucasians, and Southwestern Hispanics. The defendant argues that those statistics, introduced to indicate the significance of a match of DNA taken from the crime scene with the defendant's DNA, were meaningless without evidence that the defendant belonged to one of the three ethnic groups. See *Commonwealth* v. *Lanigan,* 419 Mass. 15, 20 (1994). Because the defendant is Puerto Rican,[7] he argues, the statistics were irrelevant and easily could have confused the jury into believing that similar statistics applied to his own racial grouping, when, in fact, no such evidence was introduced.

There was no error on the part of the defendant's trial counsel. Contrary to the defendant's assertion, the lack of reporting on the defendant's own alleged racial subgroup did not render the DNA testimony scientifically unreliable. See *Commonwealth* v. *Vao Sok,* 425 Mass. 787, 802-803 (1997). The jury were aware, from lengthy questioning of Varlaro both on direct and cross-examination, that the reported statistics did not include information on all ethnic, including Southeastern Hispanic, groups. According to Varlaro's testimony, the fact that the defendant's ethnicity might not be reported in the statistics would not affect his identification of the defendant as the source of the DNA found at the crime scene. He explained that every scientific

---

[7] There was no evidence before the jury that would have identified the defendant's ethnic background.

study published in the last fifteen years supports the proposition that a given DNA profile in any ethnic group is always rare. More importantly, the defendant's statement to the police that he cut his finger on the broken window and may have touched the victim as he ran past her on the night of the murder acts as a clear admission that the tested blood sample was his own. In light of this admission, any testimony regarding the probability of a random DNA match among various racial groups was clearly superfluous. The defendant was represented by very experienced trial counsel, who must have understood this, and who was not ineffective for failing to object to the testimony.

The defendant also complains that his trial counsel should have objected to testimony that the defendant had committed other crimes in the past, specifically, that (1) he had often used cocaine in Martinez's first-floor apartment prior to the murder; (2) at the time of his arrest, he was on probation for an unrelated offense; and (3) he told the police that he had committed "a lot of 'b and e's.' "[8] We disagree.

Evidence of prior bad acts may not be introduced for the purpose of showing the accused's propensity to commit the crime charged. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Such evidence may be admissible, however, if relevant for some other probative purpose, including for the purpose of showing intent, motive, state of mind, or some other relevant issue at trial. See *Commonwealth* v. *Leonard*, 428 Mass. 782, 786 (1999); *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 370-371 (1997), and cases cited. These determinations are left to the sound discretion of the judge, see *Commonwealth* v. *Marrero*, 427 Mass. 65, 67-68 (1998), whose decision to admit such evidence will be upheld absent clear error. See *Commonwealth* v. *Kater*, 432 Mass. 404, 415 (2000), and cases cited. Here, Martinez's testimony that the defendant had used cocaine in his apartment was relevant to prove the defendant's motive for breaking into Martinez's apartment on the night of the murder.[9]

---

[8]This testimony was introduced over a continuing objection grounded on a challenge to the voluntariness of the statement.

[9]Moreover, any harm to the defendant resulting from the testimony was of no consequence in light of his own admission that he was "fending" for drugs on the night of the murder.

Testimony that a probation officer accompanied police officers to the defendant's home with a default warrant was relevant to explain the sequence of events that took place on the day the defendant was arrested.[10] Finally, the defendant's statement that he had been involved in other "b and e's" was relevant to prove the defendant's intent and to support his admission that he had broken into the victim's house on the night of the murder.[11] The challenged testimony in context, "[the defendant] stated that he had done a lot of B and E's but he had never killed anybody" was entirely consistent with the theory of defense, and, as a practical matter, even may have helped the defendant. We conclude that the above evidence properly was admitted, and, thus, his trial counsel cannot be faulted for failing to object. See *Commonwealth* v. *Carroll*, 439 Mass. 547, 557 (2003); *Commonwealth* v. *Hogan*, 426 Mass. 424, 432 n.11 (1998).

2. *Claims of evidentiary errors.* (a) As has been indicated, the medical examiner, Dr. Evans, testified over objection based on his review of an autopsy report, diagrams, and photographs prepared, eleven years prior to trial, by another medical examiner who was no longer available to testify. The defendant does not claim that Dr. Evans was not qualified to testify, but argues that his testimony impermissibly strayed far beyond the scope of the autopsy report to speculate as to the cause of death and the amount of force necessary to inflict the victim's injuries. We reject the defendant's argument. "An expert may testify on matters within his or her expertise where the testimony will aid the jury in reaching a decision." *Commonwealth* v. *Pikul*, 400

[10]This testimony, in fact, was highlighted by the defendant's trial counsel, who questioned whether the probation officer's presence with the default warrant on the morning of the defendant's arrest was part of a trick designed to obtain the defendant's cooperation.

[11]The defendant also claims that his trial counsel was ineffective in declining the judge's offer of a limiting instruction with respect to his statement concerning the "b and e's." Trial counsel's response to the judge's offer of a curative instruction was, "I appreciate the offer, but the less said the better." As has been stated above, the defendant's trial counsel was an experienced practitioner. His decision not to accept the offered instruction was clearly tactical and, as such, was not manifestly unreasonable. See *Commonwealth* v. *Sena*, 441 Mass. 822, 825-826 (2004); *Breese* v. *Commonwealth*, 415 Mass. 249, 251 (1993).

Mass. 550, 553 (1987). "Where an expert's opinion is sufficiently grounded in the evidence, that certain facts were unknown to the expert . . . does not render the testimony inadmissible, but rather goes to the weight of the evidence." P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 7.6.4, at 390 (7th ed. 1999).

Dr. Evans's determination of death by manual strangulation was based on the trauma to the victim's neck both externally and internally, and the presence of hemorrhaging in the eyes, as documented in the autopsy report and photographs. His conclusion that the blunt chest trauma was independently severe enough to account for death was grounded on evidence of extensive bleeding into the right chest cavity associated with multiple fractures, including a large gaping spinal fracture, rib fractures, and injury to the spinal cord. His opinion that the extent of tearing and laceration of the victim's side muscles would require a large degree of force, and could have been inflicted on the victim's prone body by "stomp[ing]," rested on properly admitted evidence and, in view of his testimony that there was no evidence that a weapon had been used, was not speculative. See *Commonwealth* v. *Johnson*, 412 Mass. 368, 374 (1992). His conclusion as to the amount of force necessary to cause the injuries to the victim's chest and back was based on the nature and severity of the injuries depicted in the autopsy report and photographs, as well as on his own considerable experience as a pathologist. Contrary to the defendant's suggestion, there is no possibility that the jury would have thought that the victim herself had been hit by a vehicle or thrown out of a four-story window. The judge properly instructed the jury that they must decide how much weight to give expert testimony and what conclusions to draw from it. See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 359 (1985), cert. denied, 477 U.S. 904 (1986).

(b) The defendant asserts that it was incumbent on the judge to make a threshold inquiry as to the reliability of performing DNA testing on seven year old blood stains. He argues that, because the prosecution failed to establish the appropriate preservation of blood samples that had been stored frozen before undergoing DNA analysis, the DNA evidence was improperly admitted. We reject this argument.

Varlaro testified that items marked with bloodstains had been taken from the crime scene and tested in the Boston police crime laboratory to determine blood type and that, in 1998, these stains (having been frozen in the interim) were subjected to DNA testing. There was no objection to this testimony and no additional testimony regarding the storage conditions for these blood samples. The defendant's trial counsel, who had requested and received funds to perform his own testing, vigorously challenged the accuracy of the DNA analysis conducted by Varlaro but presented no evidence that the seven year old samples were contaminated or otherwise of questionable validity. The judge was not required to inquire further. No likelihood of a substantial miscarriage of justice is possible, in any case, because, as has been noted, the defendant conceded that the blood at the crime scene was his own.

(c) The defendant claims that the judge erred in refusing to permit him to present testimony that he had a serious problem with drugs at the time the murder was committed. The defendant argues that the judge permitted the Commonwealth to raise this issue (e.g., when it introduced evidence of the defendant's past use of cocaine, the outstanding warrant for possession of cocaine, and the defendant's statement he was "fending" for drugs on the night of the murder), yet sustained the Commonwealth's objection when his counsel attempted to elicit testimony from his wife concerning his drug problem. The defendant claims that this testimony was relevant to show that he was so far overcome by intoxicating substances on the night of the murder that he was incapable of forming the intent or knowledge necessary to commit premeditated murder, or murder with extreme atrocity or cruelty. See *Commonwealth* v. *Cruz*, 413 Mass. 686, 689 (1992). There was no error.

It is clear from the defendant's argument that his wife would have testified, not that the defendant was intoxicated on the night of the murder, but that the defendant struggled with a general, ongoing drug problem, a matter not relevant to any issue at trial. The judge properly excluded the testimony. The evidence would not, in any case, have warranted an instruction on voluntary intoxication, which is required only where the evidence suggests "a condition of 'debilitating intoxication' that

could support a reasonable doubt as to whether a defendant was capable of forming the requisite criminal intent." *Commonwealth* v. *Erdely*, 430 Mass. 149, 152 (1999), quoting *Commonwealth* v. *James*, 424 Mass. 770, 789 (1997).

3. *Prosecutorial misconduct.* (a) On direct examination, the prosecutor asked the victim's niece, Diane Greenidge, "And is there a particular reason that you pronounce your name as 'Grennich?' " The witness responded, "It's the English slave name and that's the way it's pronounced." When asked whether the victim had many family members in the area, the witness answered, "Roxbury is [an] African-American neighborhood with close-knit families that have lived there for many years so as long as [the victim had] lived there, she got to know a lot of people in the neighborhood." We reject the defendant's claim that, in eliciting this testimony, the prosecutor improperly appealed to the jury's sympathy based on the race of the victim. It is permissible to "tell the jury something of the person whose life [has] been lost in order to humanize the proceedings." *Commonwealth* v. *Degro*, 432 Mass. 319, 323 (2000), quoting *Commonwealth* v. *Santiago*, 425 Mass. 491, 495 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). Moreover, the jury already had been informed that the victim was African-American through an individual voir dire question regarding the interracial nature of this murder.[12] The jury also saw the victim's autopsy photographs. Any potential prejudice that could have arisen from comments on the victim's race would have been offset when the judge instructed the jury that they must "determine the facts based solely on a fair consideration of the evidence," and not "be swayed by sympathy or prejudice, by personal likes or dislikes towards either side."

(b) On direct examination, the director of the Boston crime laboratory, Donald Hayes, was asked over objection whether he had an opportunity to sit down with defense counsel and people who defense counsel had brought with him to the laboratory, to examine the blood test reports and exhibits and to discuss Hayes's findings. Hayes answered in the affirmative. None of

---

[12]There was no evidence, and nothing in the record suggests, that the murder was racially motivated.

the people who accompanied defense counsel to the crime lab subsequently testified at trial. The defendant argues that the testimony may have unfairly invited the jury to draw improper conclusions from the defendant's failure to call witnesses. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 287 (1990).

There is some merit to this argument. See *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134-135 & n.10 (1986) (drawing such adverse inferences in criminal prosecution "may come uncomfortably close to invading constitutional rights"). Through the testimony, the jury were informed that defense counsel had hired experts who had not appeared as witnesses. That knowledge, in turn, may have raised the inference in the jurors' minds that the defendant had elected not to call his experts as witnesses because he knew that their testimony would be damaging to him. See *Commonwealth* v. *Bryer*, 398 Mass. 9, 12 (1986) ("We are sensitive to references to a defendant's failure to adduce evidence on his behalf because of the necessity to avoid shifting the burden of proof to the defendant").[13] The general strength of the Commonwealth's evidence in this case, however, and the defendant's admission that the blood on the victim's jacket was his, leads us to conclude with confidence that the defendant was not prejudiced by any error.

(c) In his closing argument, the prosecutor told the jury to "[t]hink about [the victim's] life and remember there is nothing in her life history that would prepare her for the kind of violence, the kind of brutality, the kind of pain, the kind of suffering that [the defendant] put her through. Nothing in her life would have prepared that eighty-seven year old woman for that incident." These comments raised an immediate objection from the defendant's trial counsel on the ground that they were an improper appeal for sympathy.

We reject the defendant's claim that the prosecutor's remarks constituted an inappropriate "right to live" argument, of which

---

[13]No missing witness instruction was requested by the Commonwealth, nor was one given by the judge. The purport of the testimony challenged here was not such that the defendant's failure to produce an innocent explanation (to counteract the Commonwealth's evidence) "may be deemed by the judge to be a fair matter for comment," *Commonwealth* v. *Franklin*, 366 Mass. 284, 293-294 (1974), to which principles of the missing witness doctrine would apply. See *Commonwealth* v. *Thomas*, 429 Mass. 146, 150-151 (1999).

we repeatedly have voiced disapproval. See *Commonwealth* v. *Gentile*, 437 Mass. 569, 580 (2002); *Commonwealth* v. *Torres*, 437 Mass. 460, 464-465 (2002); *Commonwealth* v. *Lodge*, 431 Mass. 461, 470-471 (2000); *Commonwealth* v. *Barros*, 425 Mass. 572, 582 (1997). The prosecutor did not state that the victim had a right to live, but spoke generally of the type of life she had led and how her life had not prepared her for such a brutal death. The remarks were fair comment on the consciousness and degree of suffering of the victim, a factor that may be considered in deciding whether the murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-228 (1983); *Commonwealth* v. *Gould*, 380 Mass. 672, 684 (1980), quoting *Commonwealth* v. *Lacy*, 371 Mass. 363, 367 (1976) (in considering whether defendant has acted with extreme atrocity or cruelty, "the inquiry focuses both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim"). See also *Commonwealth* v. *Vizcarrondo*, 431 Mass. 360, 363 (2000) (prosecutor properly could suggest that beating and injuries inflicted by defendant, viewed in light of victim's tender age and size, constituted extremely atrocious or cruel conduct).

4. *Instruction on reasonable doubt.* There is no merit to the defendant's assertion that the jury could have been misled by one sentence in the judge's instruction on reasonable doubt. The instruction tracked the traditional Webster charge, see *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), and drew no objection. We review a judge's charge to the jury for error by reading the charge as a whole, and not by scrutinizing each sentence out of context. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 267 (1998). There is no possibility that a reasonable juror would have misunderstood the criticized sentence as directing a verdict for the Commonwealth. The sentence, in context, is entirely consistent with the *Webster* definition of reasonable doubt.

5. *G. L. c. 278, § 33E, review.* We have examined the entire record under the standard set by G. L. c. 278, § 33E, to determine whether there was error on the part of the defendant's trial counsel, the prosecutor, or the judge, that created a substantial likelihood of a miscarriage of justice, and conclude

that there is no basis to order a new trial. The defendant contends that the evidence presented by the Commonwealth supported a finding of spontaneity rather than deliberate premeditation and did not warrant a finding of extreme atrocity or cruelty. The defendant suggests that a conviction of murder in the second degree would be more consonant with justice than a conviction of murder in the first degree and, accordingly, requests that we exercise our discretion under G. L. c. 278, § 33E, to reduce the level of his guilt. We discern no reason to do so.

The Commonwealth's evidence established that the defendant brutally stomped and strangled Maude Hinds to death. Although the defendant may not have gone to 56 Clifford Street intending to commit murder, the jury heard evidence (including the defendant's own statement) that would allow them to find that the defendant, surprised by the victim in the course of breaking into her home, could have fled but instead made the deliberate choice to stay and end her life. See *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982), and cases cited ("Deliberate premeditation [can] be present even if the killing followed reflection by only a few seconds"). The jury also could have found that the murder was committed with a gratuitous use of disproportionate force. Dr. Evans testified that the victim suffered, among other injuries, a gaping fracture to her vertebra that would have rendered her paralyzed in the lower half of her body, five fractured ribs, and such hemorrhaging in her chest and back that it would have been very painful and difficult for her to breathe. He testified that the victim's death was not instantaneous (as evidenced by the accumulation of blood in her chest cavity and the swelling of her lungs) and that the severe force necessary to inflict her injuries was comparable to that of a motor vehicle traveling sixty miles per hour hitting a brick wall or of a fall from a four-story window. Having been convicted on evidence that solidly supports findings of deliberate premeditation and of extreme atrocity or cruelty, the defendant is not entitled to § 33E relief. See, e.g., *Commonwealth* v. *Knight*, 437 Mass. 487, 488 (2002); *Commonwealth* v. *Banister*, 428 Mass. 211, 217 (1998); *Com-*

*monwealth* v. *Garabedian*, 399 Mass. 304, 318 (1987); *Commonwealth* v. *Satterfield*, 362 Mass. 78, 81-82 (1972).

*Judgment affirmed.*