## COMMONWEALTH *vs.* GUALBERTO CRUZ.

Suffolk. January 8, 2010. - May 13, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Felony-Murder Rule. Firearms. Practice, Criminal,* Continuance, Opening statement, Mistrial, Assistance of counsel. *Evidence,* Prior misconduct.

At a criminal trial, the judge did not abuse her discretion in denying the defendant's motion for a continuance made on the first day of trial, where the defendant failed to provide a persuasive reason for a continuance and instead relied on general assertions that the defense would benefit from more time. [746-748]

At a murder trial, the judge did not abuse her discretion in admitting in evidence the defendant's prior bad conduct, where evidence of the defendant's volatile relationship with the victim's stepdaughter (the defendant's former girl friend) was relevant to show motive, state of mind, and intent, and where evidence of a confrontation between the victim and the defendant and a telephone call from the defendant to the victim just prior to the killing were relevant to show the defendant's state of mind; moreover, the judge appropriately balanced the probative value of the evidence against any undue prejudice. [748-751]

At a murder trial, defense counsel's proclamation, during his opening statement, that the evidence would prove beyond a reasonable doubt that the defendant had not shot the victim and had nothing whatsoever to do with the shooting did not cause sufficient confusion among the jury to justify relief under G. L. c. 278, § 33E, where any confusion was offset by the judge's admonitions — repeated to the jury from their empanelment through her final instructions — that the burden of proof was on the Commonwealth, and only the Commonwealth, to prove the defendant's guilt beyond a reasonable doubt. [751-753]

At a murder trial, the judge did not err in denying the defendant's motion for a mistrial based on the difficulties and deterioration of his relationship with counsel during the trial, where the defendant's recalcitrance and lack of cooperation had been a tactic of delay from the outset, and where the tensions between the defendant and his counsel did not affect the conduct of the trial as a whole. [753-756]

INDICTMENTS found and returned in the Superior Court Department on April 1, 2004.

The cases were tried before *Margot Botsford,* J.

*Janet H. Pumphrey* for the defendant.

*Janis DiLoreto Noble*, Assistant District Attorney (*Mark A. Hallal*, Assistant District Attorney, with her) for the Commonwealth.

CORDY, J. At approximately 5:30 P.M. on January 31, 2004, Leonardo Perez (victim) was shot and killed by an intruder while making dinner for his family in an apartment in the Jamaica Plain section of Boston. The victim's wife, Iris Morales,[1] was present in the apartment at the time and was threatened with a firearm by the intruder before he departed. Gualberto Barrero Cruz, a man familiar to the victim and his family, was indicted for the murder. He was also indicted for armed home invasion, assault by means of a dangerous weapon, unlawful possession of a firearm, and unlawful possession of ammunition. A jury returned guilty verdicts of murder in the first degree on the theory of felony-murder, armed home invasion,[2] and the unlawful possession charges.

At trial, there was ample evidence of the defendant's guilt, and he does not challenge its sufficiency on appeal. What the defendant does claim on appeal are four errors that he argues require the reversal of his convictions: (1) the judge abused her discretion in denying his motion for a continuance made on the first day of trial; (2) the judge abused her discretion when she admitted in evidence the defendant's prior bad conduct; (3) defense counsel's statement in his opening to the effect that the evidence was going to establish beyond a reasonable doubt that the defendant did not shoot the victim caused sufficient confusion among the jury to justify relief under G. L. c. 278, § 33E; and (4) the judge denied the defendant his right to counsel when she denied his motion for a mistrial based on the difficulties and deterioration of his relationship with counsel during the trial. We conclude that there were no errors and, thus, no substantial likelihood of miscarriage

[1]Although not legally married, Leonardo Perez (victim) and Iris Morales considered each other as husband and wife and had lived together as such for eleven years. The victim was not the father of Morales's four children, but they considered him to be their stepfather. Their children, in turn, regarded the victim as their grandfather.

[2]This count was dismissed by the judge because of the merger doctrine. In order for proof of a felony to substitute for the malice "normally required" for a conviction of murder in the first degree, it must be shown that the felony was "sufficiently independent." *Commonwealth* v. *Gunter*, 427 Mass. 259, 276 (1998). Where as here, the jury answered a special question in the affirmative to indicate that the conviction was based on the felony-murder theory, the "underlying felony . . . is duplicative" and must be dismissed. *Id.*

of justice. We have also reviewed the entire record of the trial, and based on that review, we conclude that there is no basis to grant the defendant relief pursuant to our authority under G. L. c. 278, § 33E.

*The evidence at trial.* Based on the evidence presented at trial, the jury could have found the following facts. The defendant was the former boy friend of Iris Sanchez, one of Morales's daughters and the victim's stepdaughter. Sanchez and the defendant had a child together in September of 2002. The two of them lived together until September, 2003. During this time, Sanchez regularly brought the defendant to the apartment where her mother and the victim lived, and the victim, Morales, and Morales's other three children (Sanchez's siblings) knew him well.

The victim and Sanchez worked at the same company, and Sanchez would often leave her young child at the victim's apartment with Morales while Sanchez was at work.[3]

By September, 2003, the relationship between Sanchez and the defendant had deteriorated. This deterioration culminated that month in a physical confrontation between them in the parking lot at Sanchez's workplace. Apparently, the defendant thought Sanchez might be dating someone else, and when she entered the parking lot in a company van driven by a coworker (after having worked outside the office distributing advertising fliers for most of the day), the defendant grabbed Sanchez and violently pulled her out of the vehicle. Before anything further happened, the driver of the van stepped between them and Sanchez was able to walk away.

As far as Sanchez was concerned, this incident ended her relationship with the defendant and she ordered him to move out of their apartment, which he did. However, the defendant continued to contact Sanchez in a futile effort to reconcile. In October, 2003, he telephoned Sanchez and spoke to her in a threatening manner, stating that she had "until October 31 to get back with him," and if she did not, he had "looked into it," and "it was only going to cost him about three thousand dollars." She viewed this statement as a threat and asked him if he meant it that way, to which he responded, "Take it any way you want."

---

[3]Morales also watched some of her other young grandchildren when their parents (her daughters) were working.

The next day she went to the Dorchester Division of the Boston Municipal Court Department and applied for a temporary protective order. The temporary protective order, which was eventually admitted in evidence at the trial, was issued on October 27, 2003. It included an affidavit from Sanchez describing this telephone conversation. After a hearing on November 10, 2003, which the defendant did not attend, the protective order was extended for one year.

Although the protective order prohibited the defendant from contacting Sanchez, and he had notice of the order, the defendant continued to telephone her on an almost daily basis. In addition, on November 16, 2003 (Sanchez's birthday), the defendant attempted to enter her workplace to give her flowers. The victim, who was working that day, intercepted the defendant, told him he could not be there, and escorted him off the premises. The defendant, however, persisted in his attempts to contact Sanchez, and was often seen parked in his vehicle outside of the victim's apartment, apparently watching or looking for Sanchez.[4]

A few days before January 31, 2004, the defendant telephoned the victim at his apartment. Morales answered the telephone and called to the victim, who picked up the telephone call on another extension. Morales listened to the conversation. The defendant told the victim not to "butt into the relationship" between him and Sanchez or he would "kill him."[5]

Late in the day on January 31, the defendant parked his vehicle in front of the victim's apartment, where Sanchez was to return after work to pick up her child. After Sanchez arrived, the defendant, armed with a nine millimeter hand gun, went around to the rear of the apartment building and entered the kitchen of the apartment through a back door. The jury could have concluded that the defendant intended to confront and harm either Sanchez or the victim.[6]

---

[4]None of the contacts made by the defendant, although apparently in violation of the protective order, was reported to the police.

[5]This was Morales's testimony at trial. She was impeached on cross-examination with her testimony before the grand jury that did not include a threat to "kill" the victim, and only recounted the defendant stating that "something was going to happen to them if [the victim] continued to interfere with [Sanchez's] life."

[6]Although Sanchez had been in the apartment with her mother and her

The victim was in the kitchen cooking as the defendant entered. There was a struggle. The victim could be heard crying out, "Let go of me." Morales, one of her daughters, and several young grandchildren were in the living room when they heard the victim cry out. The daughter went to the kitchen and saw the defendant with his arm around the victim's neck holding a gun over his head. She ran out of the kitchen. Morales told her to run outside, and Morales proceeded to go to the kitchen, where she observed the victim, now on his knees, and the defendant pointing a gun at him.

Morales retreated to the living room; closed and locked the door; heard a gun shot, and dialed 911. The defendant then broke down the living room door and pointed the gun at her. Morales picked up the defendant's daughter and told him "not to do it." The defendant told her that he had "done it" because they had taken away his daughter. He then left through the front door, walked over to his vehicle, threw the hand gun in the back seat, and drove away. Morales returned to the kitchen and found the victim lying on the floor dying. The cause of his death was a single gun shot passing through his back, piercing the heart muscle, and exiting his chest.

Two weeks later, based on a tip, the police located and arrested the defendant in Lynn. A nine millimeter hand gun seized from him during the arrest was tested by the ballistics laboratory of the Boston police department, and was determined to have fired the shell casing found at the murder scene.

The defense at trial combined the possibility of mistaken identification with a blistering attack on the reliability of the testing done by the Boston police ballistics laboratory.[7] The defense of mistaken identification was largely premised on differences in the testimony of the various witnesses about the shooter's clothing and hair on the day of the shooting. Although it was a difficult defense on which to prevail, defense counsel vigorously challenged every witness with inconsistencies in their descriptions of

child, she coincidentally left through the front door with one of her sisters (to go to the supermarket) as the defendant made his way around to the back of the apartment building.

[7] The Commonwealth's ballistician had taken no photographs of the striations he testified were a match, nor had he made any notes of his examination and comparisons.

the shooter, and inconsistencies between their prior grand jury and trial testimony. The defendant did not testify.[8]

*Discussion.* a. *Continuances.* The defendant's counsel at trial was actually his second appointed counsel. His first counsel was appointed at arraignment in April, 2004, and reported ready for trial in January, 2006. The case was then scheduled for trial to begin March 24, 2006. Before that date, his first counsel moved to withdraw based, apparently, on a conflict that arose as the trial approached.[9] The defendant did not object. New trial counsel was appointed on March 14, 2006. Prior counsel's files and preparation were turned over to him, and the case was continued for trial by agreement, first to June 5, and then to June 9, 2006.[10] In the interim, trial counsel sought and obtained funds for a Spanish interpreter (the defendant's primary language) and funds for additional investigation.

On May 31, defense counsel filed a motion to advance the case and continue the trial date. In the motion, trial counsel advised the court that there had been a "relationship ending" argument between the defense investigator and the defendant; that a specific defense now being discussed by the defendant had yet to be investigated; that trial counsel had not been able to establish the trust and confidence of the defendant to enable them to work together; and that the time given him to prepare for the trial (ninety days) was insufficient. After a hearing held

---

[8]At the close of the Commonwealth's case, defense counsel asked the judge to make specific inquiry of the defendant as to whether he wanted to testify, because counsel could not get a clear answer to his own inquiry on that subject. The judge did inquire, and explained to the defendant that he had a right to testify, and that if he chose not to testify, the jury would be instructed that they could not "consider in any way the fact that you have not testified." The defendant agreed to speak with counsel about the matter of his testifying, and, after further discussion between them, they reported back to the judge that the defendant had decided not to testify.

[9]The record of the hearing at which the judge allowed counsel to withdraw was impounded. The judge, however, noted that it concerned a conflict that did not have to do with trial preparation.

[10]On April 24, 2006, trial counsel filed a motion to continue the trial then scheduled to start on June 5. As grounds for this motion, counsel cited his other criminal cases scheduled for trials through May 24, 2006, and expressed the concern that he might not be fully prepared for the present trial by June 5. This motion does not appear to have been acted on, but a status conference was held on May 3, 2006, at which time the case was continued for trial (empanelment only) to Friday, June 9, 2006.

on May 31, at which the defendant was present, the motion was denied.[11] Other motions of the defendant, including a motion for additional defense investigator funds, were allowed.

On June 9, the first day of trial, prior to empanelment, the defendant moved to represent himself and for a continuance, arguing that there had been insufficient time to prepare for trial. The judge engaged the defendant in a colloquy with regard to his motions, during which the defendant expressed his view that (1) his prior counsel and he had not communicated well about the defense and had not done the specific investigation the defendant had asked him to do; and (2) his present counsel had had only ninety days to pick up and prepare the case and that "it's a very short time for him to have an opportunity to investigate a lot of things that he is not aware of."

The judge responded that the issue had come up before, that prior counsel had been prepared and ready for trial months ago, and had passed the case material to current trial counsel who had had not only the benefit of that preparation but had requested and received additional investigative resources. The judge concluded that there had been sufficient time to prepare the case (a case that she noted was more than two years old), and in the absence of specifics as to what had not or could not have been done since new counsel entered the case, she was denying the motion to continue. No specifics were forthcoming from the defendant or trial counsel.

"The decision whether to grant a motion to continue lies within the sound discretion of the trial judge." *Commonwealth* v. *Miles*, 420 Mass. 67, 85 (1995). Absent abuse of that discretion, a judge's decision to deny a defendant's motion for a continuance will not constitute error. *Id.* In making this decision, however, a judge may not exercise her discretion in such a way that denial of the continuance deprives the defendant of the right to effective assistance of counsel and to due process of law. *Id.* While there is "no 'mechanical test' " in making this determination, *Commonwealth* v. *Cavanaugh*, 371 Mass. 46, 51 (1976), we are guided by "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.*, quoting *Ungar* v. *Sarafite*,

---

[11]There is no transcript of this hearing.

376 U.S. 575, 589 (1964). A trial judge should give "due weight" to concerns about judicial economy and the avoidance of delays that do not "measurably contribute to the resolution of a particular controversy." *Commonwealth* v. *Gilchrest*, 364 Mass. 272, 276-277 (1973). Cf. *Commonwealth* v. *Cavanaugh*, *supra*, quoting *Ungar* v. *Sarafite*, *supra* ("myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality").

The judge did not abuse her discretion. Our cases recognize that the reasons underlying a request for a continuance are to be given significance in the judge's decision to grant or deny such a request. See *Commonwealth* v. *Cavanaugh*, *supra*. Here, the defendant failed to provide a persuasive reason for a continuance and instead relied on general assertions that the defense could "benefit" from more time. In light of the history of the case, the judge was appropriately unpersuaded that a delay would "measurably contribute to the resolution of the case." *Commonwealth* v. *Miles*, *supra* (affirming denial of continuance where defendant's only reasons for request were desires to acquire transcript of prior trial and to investigate expert witness).

With respect to the defendant's request that he be permitted to proceed without counsel, the judge informed him that he was entitled to represent himself, but strongly advised him not to do so because "an attorney representing you is far more protective of your rights." The defendant agreed that he would remain represented by trial counsel.

b. *Admission of prior bad acts.* The Commonwealth's theory of the case was that the defendant was angry with Sanchez over her refusal to reconcile with him, and went to the victim's home on the day of the murder to kill her, but when the victim got in the way, as he had before, the defendant killed him instead. Thus, evidence regarding the relationship between the defendant and Sanchez was critical to establishing the defendant's motive and state of mind on the day of the murder. Consequently, the Commonwealth filed a motion in limine prior to trial seeking permission to introduce seven instances of the defendant's acts of aggression or violence against Sanchez and the victim. The prosecutor explained that the acts were relevant to show, among other things, the defendant's motive and state of mind when he

entered the victim's apartment, as well as the context of and the reason for his armed visit on January 31.

Specifically, the Commonwealth sought to admit (1) the testimony of Sanchez about the incident in the parking lot of her place of employment in September, 2003, where the defendant violently pulled Sanchez out of a company van and berated her for allegedly being unfaithful to him; (2) Sanchez's testimony about the threatening telephone call made to her by the defendant in October, 2003, which provided the basis for the protective order, and a certified copy of the protective order itself; (3) the testimony of Sanchez and two of her coworkers about various appearances by the defendant at Sanchez's place of employment (in violation of the protective order) between October, 2003, and January, 2004, including on November 16, when the defendant was confronted by the victim, who asked him to leave and escorted him off the property; (4) the testimony of Morales about the telephone call made by the defendant to the victim, shortly before January 31, during which the defendant told him that "he should not butt into the relationship," and that if he continued to interfere, the defendant would "kill him"; (5) the testimony of Sanchez about a physical assault she suffered at the defendant's hands and his attendant threats that occurred in August or September of 2003 at her residence; (6) the testimony of one of her sisters about a verbal argument that occurred between the defendant and the victim in September of 2003; and (7) the testimony of Sanchez that the defendant telephoned her at her home a few days before January 31, 2004, and asked to speak with their daughter.

The defendant moved to exclude evidence of the prior bad acts involving Sanchez on the grounds of relevance and prejudice. The judge initially ruled that Sanchez could testify about the threatening telephone call that resulted in the protective order, and reserved ruling on the other proposed acts for consideration during the trial. At trial, the judge permitted testimony about both the parking lot confrontation between the defendant and Sanchez in September and the November 16 confrontation between the victim and the defendant. She also permitted Morales to testify about the threatening telephone call made by the defendant to the victim shortly before the shooting.

Prior to Sanchez's testimony, the judge again addressed with

the attorneys at sidebar the appropriate bounds of the testimony with respect to the prior bad acts, and declined to admit testimony of the physical assault suffered by Sanchez at the defendant's hands in August or September of 2003, and the testimony of Sanchez's sister, Marisa, about an argument that she had witnessed in the same month between the defendant and the victim. Her reason for declining to admit these prior bad acts was essentially that they were too far removed in time from the shooting to be more relevant than prejudicial. During Sanchez's testimony, the judge did allow the protective order itself to be received in evidence.[12]

Each time a witness testified to one of the prior acts that had been ruled admissible, the judge carefully instructed the jury regarding the limited purpose for which they could consider the testimony. She also instructed them thoroughly during her final instructions that the evidence was admissible *only* on the issue of the state of mind of the defendant concerning Sanchez, and the status of the relationship as it might bear on his state of mind, intent, and motive on January 31, 2004, and, that it was not evidence that could be considered for any other purpose, such as the defendant's character or whether he was the kind of

---

[12]Defense counsel made a partial objection to the admission of the protective order. His concerns at trial stemmed from the fact that the protective order referenced an outstanding warrant for the defendant's arrest. The judge allowed the prosecutor to use the protective order in his direct examination of Sanchez, but prevented him from publishing it to the jury until the arrest warrant information could be redacted. When the prosecutor questioned Sanchez, the protective order was not admitted in evidence, but merely marked for identification. During the defendant's cross-examination of Sanchez, defense counsel made reference to the protective order, after which the judge summoned the attorneys to sidebar to discuss further its admission. She expressed concern about admitting the affidavit that accompanied the order because the affidavit constituted hearsay. In his cross-examination, defense counsel used the affidavit extensively to impeach the testimony of Sanchez about the fact that she never claimed in her affidavit that the defendant intended to harm or kill her. There was then further use of the protective order in both redirect and recross-examination. After the recross-examination, the prosecutor moved to admit the entire protective order in evidence based on the way the testimony had developed at trial. The judge agreed and defense counsel did not object. Given Sanchez's testimony about her tumultuous relationship with the defendant and the Commonwealth's theory that the defendant had arrived at the victim's apartment to harm Sanchez when the victim was killed, the protective order was relevant and there was no error in its admission in evidence.

person likely to commit the crimes with which he was charged.[13]

It is well established that the prosecution may not introduce evidence of the defendant's prior misconduct for the purpose of showing that he has a bad character or the propensity to commit the crime charged. See Mass. G. Evid. § 404(a) (2010). This evidence may be admissible if it is relevant for some other purpose. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986), and cases cited; Mass. G. Evid., *supra* at § 404(b). Where the evidence is only marginally relevant, it should be excluded unless the probative value of the evidence outweighs the undue prejudice "that may flow from it." *Commonwealth* v. *Helfant, supra* at 225. A judge's decision to admit such evidence is upheld unless there is clear error. *Commonwealth* v. *DelValle*, 443 Mass. 782, 790 (2005).

Here, evidence of the defendant's volatile relationship with Sanchez, including the protective order, was relevant to show motive, state of mind, and intent. In addition, both the confrontation between the victim and the defendant on November 16, and the telephone call to the victim made just prior to January 31 were relevant to show the defendant's state of mind with respect to the victim's involvement in preventing the defendant from contacting Sanchez and his daughter.

After concluding that the evidence was relevant, the judge appropriately balanced its probative value against any undue prejudice. Similar to the "comprehensive ruling" issued by the judge in *Commonwealth* v. *Martino*, 412 Mass. 267, 279 (1992), the judge here was carefully attuned to the danger of prejudice to the defendant. Like the trial judge in the *Martino* case, she "engaged in a scrupulous analysis of all the evidence proposed by the Commonwealth," and her rulings reflected a heightened sensitivity to "minimiz[ing] the prejudicial impact" of the evidence of the defendant's relationship with Sanchez. *Id.* at 280. There was no error.

c. *Opening statement.* During his opening, defense counsel proclaimed the defendant's innocence in the following words:

---

[13]As to the protective order, the judge cautioned the jury that it was admitted for two purposes: on the issue of the relationship between the defendant and Sanchez and whether there were restrictions on where the defendant could be at any given time.

"There's going to be a lot of evidence in the case, a lot of wit-
nesses, and the evidence is going to prove to you beyond a
reasonable doubt, after you hear every witness, see every photo-
graph, that [the defendant] did not shoot [the victim]. He had
nothing whatsoever to do with that shooting. There was no plan.
There was no animosity, no bad blood between [the victim] and
[the defendant], none at all." The defendant now claims, essen-
tially, that the confusion caused by this statement with respect to
the burden of proof requires relief under G. L. c. 278, § 33E.

Due process requires that the government prove "beyond a
reasonable doubt of every fact necessary to constitute the crime
with which [the defendant] is charged." *In re Winship*, 397 U.S.
358, 364 (1970). Instructions to the jury that would lead them
to believe otherwise are constitutional error. See, e.g., *Sand-
strom* v. *Montana*, 442 U.S. 510, 521 (1979). The defendant
concedes that the challenged statement made in this case was
made by defense counsel and was not within the judge's instruc-
tions to the jury. He argues, however, that the comments con-
stituted an "unambiguous reversal" of the burden of proof, and
coupled with the fact that defense counsel spoke them early in
the trial, they had the effect of leaving the jury with an improper
first impression. He relies on *Sullivan* v. *Louisiana*, 508 U.S.
275, 281-282 (1993), for the proposition that the confusion cre-
ated by defense counsel's comments require reversal or a lesser
degree of guilt.

The defendant's reliance on the *Sullivan* decision is mis-
placed. In that case, the United States Supreme Court held that
the judge's reasonable doubt instruction was structural error,
requiring reversal because of the fundamental importance of the
integrity of jury verdicts. See *id.* at 281-282 ("deprivation of
[the right to trial by jury], with consequences that are necessarily
unquantifiable and indeterminate, unquestionably qualifies as
'structural error' "). Here, while defense counsel's statement
might have been unnecessarily ambitious, any confusion was off-
set by the judge's admonitions — repeated to the jury from their
empanelment through her final instructions — that the burden of
proof was on the Commonwealth and only the Commonwealth
to prove the defendant's guilt beyond a reasonable doubt.[14]

---

[14]Trial counsel did not repeat the challenged statement during closing
argument.

Cf. *Commonwealth* v. *Maynard*, 436 Mass. 558, 571 (2002) (judge's repeated instructions regarding opening statements and closing arguments "ensured that the jury understood their role as the sole fact finders and were aware that nothing said in closing arguments was to be considered as evidence"); *Commonwealth* v. *Fryar*, 425 Mass. 237, 250, cert. denied, 522 U.S. 1033 (1997) (prosecutor's remarks viewed in light of entire argument, judge's instructions, and evidence at trial). There is no basis here for either reversal of the defendant's conviction or relief from the degree of murder pursuant to G. L. c. 278, § 33E.

d. *Denial of right to counsel and denial of motion for mistrial.* The defendant argues that he is entitled to relief under G. L. c. 278, § 33E, because the judge erred in declining to grant a mistrial based on his attorney's alleged lack of preparation, and the need for more time to prepare the case. Specifically, on the fourth day of trial, the defendant again addressed the judge directly, expressing his concerns about defense counsel's lack of a plan for defending him in the case.[15] Defense counsel then moved for a mistrial, asserting that the defendant had surprised him by providing him with information that entirely changed the focus of the defense and would require additional defense witnesses. The judge denied the motion, noting that if the defendant had additional witnesses, she was willing to discuss their appearances at trial, but she needed to know the nature of their proffered testimony.[16]

After a discussion of other matters, the issue was revisited.

---

[15]The defendant made the following statement: "The attorney and I were very confused because he hasn't had enough [time] to prepare for representing me in this case. We haven't done any planning or anything. It's very short time for him to prepare. He, right now he doesn't have a very precise plan on how, on what theory he is going to defend to represent me. I want justice to be done and I told you before that it was a very short time for my attorney so I cannot go on like this."

[16]In denying the motion, the judge explained, "[W]e have addressed this issue before. I'm not going to grant a mistrial. I think your attorney articulated . a defense in his opening statement. If there are additional witnesses, we discussed this before, but I'm willing to discuss individuals, someone needs to bring it to my attention, but I think at this time I am not going to grant a mistrial. The trial has started. From my perception, [trial counsel] is representing [the defendant] competently, skillfully, and asking good questions of the Commonwealth's witnesses and has articulated a theory of defense. So I'm not going to grant a mistrial."

Defense counsel, the prosecutor, and the judge discussed the possibility of introducing the testimony of the still unidentified, additional witnesses. Defense counsel represented to the judge that he had a list of the witnesses in his briefcase. The judge indicated that counsel should bring particular witnesses to her attention so they could be discussed. She also suggested that counsel should talk further with the defendant about the matter. At no time thereafter were the names of any prospective defense witnesses brought to the judge's attention.

Shortly after denying the defendant's motion for a mistrial, the judge asked to see the attorneys at sidebar and inquired about the fact that the defendant had removed his earphones and was not listening to the simultaneous translation of the proceeding. Defense counsel explained that the defendant was refusing to communicate with him and reiterated that he had received information from the defendant that would now require the case to proceed in an entirely different direction and would require additional witnesses, including two unnamed experts and some civilians.[17] Defense counsel again moved for a mistrial on the basis that his relationship with the defendant had broken down irretrievably and that he was unable to represent him effectively. The Commonwealth opposed this motion, pointing out that the crime had happened more than two years previously, that present counsel had the benefit of prior counsel's preparation, that the defendant's tactics stemmed from a desire to delay resolution of the case, and that the trial was one-third completed. The judge acknowledged that defense counsel had previously filed motions to continue based on lack of time, but explained that the defendant could have provided the names of additional witnesses much earlier, and that there was nothing she had heard that suggested that the witnesses were unknown to the defendant until midway through the trial. She reiterated that she was not prepared to grant a mistrial, but that she would speak with the defendant directly.

At this point the sidebar conversation was interrupted by a court officer who informed the judge that the defendant had said he was going "to do something" when the jury returned to

---

[17]Again, the identities of any such "witnesses" were not made known to the judge.

the court room. The judge then asked the defendant to put his earphones back on and addressed him in open court as follows:

> "I appreciate that you feel that you have not had suf-ficient time but this is an issue, this case has been pending for more than two years. If there are witnesses whose names you've just given to [defense counsel], I do think those witnesses, those names, were known to you before today or last night. The trial has been scheduled. It needs to go forward. Now, I understand that you feel frustrated, that you don't want to participate but I tell you that it is in your interest to participate and I will also tell you that you need to — whether you participate or not, I hope you do and I hope you keep the earphones on, but you cannot take some action that is going to disrupt this trial because all that does, it's not going to get you anywhere, and there's going to be swift action against you if you do that. So you need to sit, listen, participate. This is your trial and you just simply cannot take some action that is going to try to disrupt it. Do you understand me?"

The trial then continued without incident. Later that day, the defendant again asked to address the judge directly, and pro-ceeded to complain about his disagreements with defense counsel regarding the theory of his defense. At this point, the judge asked the prosecutors to leave and she spoke further with the defendant and his counsel on the subject. The defendant essentially com-plained that defense counsel was not listening to him or taking his suggestions with respect to the questioning of the witnesses, whom he felt were misstating the facts and contradicting them-selves.

The judge then suggested that the defendant listen carefully to counsel's judgment about whether certain questions should be asked, but that if there was still disagreement as to particular questions that the defendant wanted asked, defense counsel was to come to sidebar and put defendant's suggested questions on the record. The defendant appeared to agree to that procedure. No such questions were brought to the judge's attention during the remainder of the trial. At the end of the sixth day of trial, the judge observed that the defendant was having a chance to discuss his proposed questions with defense counsel, and asked the defend-ant if that was the case. He agreed it was.

A judge's decision to declare a mistrial is within her discretion. *Commonwealth* v. *Druce*, 453 Mass. 686, 701 (2009). The defendant has the "heavy burden" of showing that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her]." *Id.*, quoting *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001). In the context of the repeated and careful manner with which the judge handled the defendant's requests, the defendant has not met that burden.

The first motion for a mistrial was premised on the same basis (insufficient time to prepare for trial) as the motion for continuance, which, as we have discussed, was properly denied. The judge appropriately was persuaded that the defendant's recalcitrance and lack of cooperation had been a tactic of delay since the beginning of the case, and that there was no legitimate basis on which to grant a mistrial. There was no abuse of discretion.

As to the second motion for a mistrial, which defense counsel argued was justified by the breakdown of the attorney-client relationship, the judge was within her discretion to deny this motion as well. While denying the motion, the judge also deftly attempted to deal with the concerns raised by defense counsel by addressing the defendant directly to reiterate the importance of the process and his participation in it. In these circumstances, where the judge attempted to facilitate the defendant's cooperation with his attorney, she did not abuse her discretion in allowing the trial to proceed to its conclusion. Cf. *Commonwealth* v. *Tuitt*, 393 Mass. 801, 806 (1985). The breakdown of the attorney-client relationship is a basis for a new trial only when it leads to an "apparently unjust verdict," deprives the defendant of an adequate defense, or threatens his right to a fair trial. *Id.*, quoting *United States* v. *Calabro*, 467 F.2d 973, 986 (2d Cir. 1972), cert. denied, 410 U.S. 926 (1973), and cases cited. Here, as in the *Tuitt* case, the record indicates that the tensions between the defendant and his counsel "did not affect the conduct of the trial as a whole," *id.* at 807, quoting *Commonwealth* v. *Miskel*, 364 Mass. 783, 790 n.3 (1974), and therefore it was not error for the judge to decline to grant a mistrial.

*Conclusion.* We have reviewed the record in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree, regardless of whether such grounds were raised on appeal. We

conclude that the evidence supported the defendant's conviction of murder in the first degree by felony-murder, the defendant was represented by effective counsel, there was no unfairness in the proceedings, and there is no basis on which to reduce the verdict.

*Judgments affirmed.*