NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11669

COMMONWEALTH  vs.  TIMOTHY BROWN.


Middlesex.      March 10, 2017. - September 20, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, Budd,
& Cypher, JJ.[1]


Homicide.  Felony-Murder Rule.  Home Invasion.  Robbery.
    Firearms.  Joint Enterprise.  Accessory and Principal.
    Practice, Criminal, Capital case, Instructions to jury,
    Argument by prosecutor, Opening statement, Jury and jurors,
    Voir dire, Presumptions and burden of proof.  Evidence,
    Joint venturer, Prior misconduct.



    Indictments found and returned in the Superior Court
Department on December 22, 2009.

    The cases were tried before Sandra L. Hamlin, J.


    David H. Mirsky for the defendant.
    Melissa Weisgold Johnsen, Assistant District Attorney, for
the Commonwealth.


    GAZIANO, J.  We address, in this opinion, the scope of

criminal liability under the common-law felony-murder rule.  The

---

[1] Justice Hines participated in the deliberation on this
case prior to her retirement.

charges stem from an attempted armed robbery and home invasion into a Lowell townhouse shared by Hector and Tony Delgado. Two armed gunmen fatally shot the brothers during the botched robbery. The defendant was not present at the scene. The Commonwealth alleged that the defendant was liable as an accomplice to felony-murder because he supplied one of the gunmen with a pistol and provided hooded sweatshirts to the intruders to help them conceal their identities. A Superior Court jury convicted the defendant of two counts of felony-murder in the first degree based on the predicate felonies of an attempted commission of armed robbery, home invasion, unlawful possession of a firearm, and unlawful possession of ammunition.

The defendant raises the following claims on appeal: (1) the Commonwealth failed to produce sufficient evidence to prove that he was a knowing participant in the felony-murders; (2) the judge provided erroneous instructions on shared intent and accomplice liability; (3) portions of the prosecutor's opening statement and closing argument were improper; (4) the judge should have excluded prejudicial evidence of prior misconduct; (5) the judge asked improper voir dire questions of potential jurors; and (6) we should abolish the felony-murder rule. The defendant also asks us to order a new trial under our extraordinary authority pursuant to G. L. c. 278, § 33E.

We conclude that the Commonwealth introduced sufficient evidence to prove that the defendant knowingly participated in the underlying felonies and, therefore, was an accomplice to felony-murder.  We conclude also that the defendant's other challenges do not raise error warranting reversal or a new trial as to any of the convictions.  Nonetheless, in the circumstances of this case, we are convinced that, pursuant to our authority under G. L. c. 278, § 33E, the interests of justice require that the degree of guilt be reduced to that of murder in the second degree.

As to whether we should abolish the common-law felony-murder rule, a unanimous court concludes that the felony-murder rule is constitutional.  However, a majority of Justices, through the concurrence of Chief Justice Gants, conclude that the scope of felony-murder liability should be prospectively narrowed, and hold that, in trials that commence after the date of the opinion in this case, a defendant may not be convicted of murder without proof of one of the three prongs of malice.  As a result, in the future, felony-murder is no longer an independent theory of liability for murder.  Rather, felony-murder is limited to its statutory role under G. L. c. 265, § 1, as an aggravating element of murder, permitting a jury to find a defendant guilty of murder in the first degree where the murder was committed in the course of a felony punishable by life

imprisonment even if it was not committed with deliberate premeditation or with extreme atrocity or cruelty. Because the majority holding as to common-law felony-murder liability is prospective in effect, it does not affect the judgment reached in this case. Because I disagree with that holding, I write separately in a concurrence to explain my reasoning.

1. Background. Because the defendant challenges the sufficiency of the evidence of the extent of his involvement in the armed home invasion, and his shared intent to commit that crime, we recite the facts the jury could have found in some detail.

a. Facts. On the evening of October 22, 2009, the defendant was a passenger in a green Honda Civic automobile that was being driven around the Pawtucketville section of Lowell. The other occupants of the vehicle were his friends Ariel Hernandez, Giovanni Hill, and Darien Doby. Hernandez was the driver. Hill was in the front passenger seat, and the defendant and Doby shared the rear passenger seat. Hernandez drove past two men walking on the street and raised the possibility of robbing them. The passengers convinced Hernandez not to do so.

A short time later, Hill and Hernandez noticed two women walking down the street. Hernandez pulled into a side street and parked. Hill and Hernandez got out of the vehicle and Hernandez removed a firearm from the trunk. The two rounded the

corner and confronted the women while the defendant and Doby waited in the vehicle. Hill stood and watched from a few feet away as Hernandez, gun in hand, grabbed their purses. The two men returned to the vehicle, and Hernandez drove away, with the purses and the handgun in his lap. He stopped at a friend's house to exchange the green hooded sweatshirt he had been wearing for a black sweatshirt without a hood.

The defendant, Doby, and Hill left the friend's house, while Hernandez stayed behind. The four men later met at the defendant's one-bedroom apartment. Hernandez stashed the handgun he had used in the robbery (a nine millimeter pistol) in a kitchen cabinet above the refrigerator. He rifled through the purses, pulling out cash, driver's licenses, and automated teller machine (ATM) cards. Hernandez found what appeared to be a passcode for one of the ATM cards written on a scrap of paper, and sent Hill to a bank to attempt to withdraw money with the card. Before he left, Hill borrowed the defendant's black sweatshirt so he could change out of the jacket he had worn during the robbery. When he returned, Hill reported that he had been unsuccessful in withdrawing any money.

Later, at approximately 12:15 A.M., two cousins, Jamal and Karon McDougal, visited the defendant's apartment.[2] They were

---

[2] Because they share a last name, we refer to Jamal and Karon McDougal by their first names.

joined by one of their friends, Joshua Silva. While gathered in the kitchen with the defendant, Jamal asked Hernandez if he wanted to participate in robbing someone who owed money to one of Jamal's friends. Karon predicted that the robbery would be "pretty easy." He warned the others, however, that they were going to rob two "pretty big guys" who worked in bars.[3] Hernandez agreed to participate in the robbery. Silva joined them as the getaway driver.

Once Silva agreed to participate, Hernandez urged, "If we're going to do it, let's go do it now." Hernandez retrieved his gun from the kitchen cabinet, looked it over, and tucked it inside his waistband. Still wearing the hoodless black sweatshirt he had changed into after the earlier robbery, Hernandez asked the defendant for a hooded sweatshirt so that he could "hide his face." The defendant provided Hernandez with a hooded sweatshirt with a front zipper. Hernandez complained that the zipper was broken and that some part of his shirt would be visible. The defendant then gave Hernandez a black and red pullover-style hooded sweatshirt with a white Red Sox "B" logo on the front. Jamal and Karon also borrowed hooded sweatshirts

---

[3] In addition to his full-time job, Hector, one of the victims, worked part time as a doorman at a local bar. Tony, the other victim, managed that bar, and supplemented his income by selling small "dime bag" quantities of marijuana from the townhouse in Lowell where the brothers and their housemates lived.

from the defendant.

Before leaving, Jamal asked to borrow the defendant's "burner" (gun).  At first, the defendant hesitated, stating his concern that something might happen to his gun.  Hernandez and Karon then urged the defendant to allow Jamal to borrow the gun, promising that "nothing's going to happen to it."  The defendant eventually gave Jamal a .380 pistol that had been stored underneath his bed.

Jamal, Karon, Hernandez, and Silva left the defendant's apartment and drove in Silva's Toyota Camry automobile to the victims' townhouse.  Silva drove, and Jamal gave directions. After Silva parked on a nearby side street, Jamal, Karon, and Hernandez got out and approached the townhouse, while Silva waited in the vehicle.  Shortly after 1 A.M., the occupants of the townhouse heard loud banging on the front door.  From a fourth-floor window, Tony called out, "Who's there?"  A voice that sounded female responded "Nicole," or "Nicki."  Tony went downstairs and opened the front door.  His housemates heard a scuffle at the bottom of the stairs near the door, then Jamal and Hernandez chased Tony up the stairs into the second-floor living room.

A visitor had been sleeping on the living room couch.  He saw Jamal threaten Tony with a gun, demanding, "Where's everything?"  Tony responded that "[a]ll [he] see[s] is dimes."

The visitor was unable to identify Jamal, whose face was obscured by a hooded sweatshirt. Hector and one of his roommates, Brian Staples, headed downstairs from their third-floor bedrooms and entered the living room. At that point, Jamal had Tony in a headlock and was pointing the gun at his head.[4] Hernandez rushed toward Staples, brandishing a gun, and ordered him upstairs. Staples and Hector ran upstairs to hide. Tony managed to break free from Jamal and also ran up the stairs. Jamal and Hernandez followed him.

From his hiding place, Staples heard Hector's door being kicked in, followed by an argument, and then gunshots. Once the shooting stopped, Hector was found lying face up on his bed, gasping for air. He had been shot three times and shortly thereafter died of multiple gunshot wounds. Tony, fatally shot in the abdomen, managed to stagger to the fourth floor, where he was treated at the scene before he died. Police recovered five nine millimeter cartridge casings from Hector's bedroom.

After the gunshots, Jamal and Hernandez ran outside, cheering and exchanging "high fives." They met up with Karon and Silva, and drove back to the defendant's apartment. En

---

[4] Jamal and Hernandez told Silva, the getaway driver, that Staples had been unable to see the face of the person who grabbed Tony because the assailant "had the hood on." Staples, however, had been able to see a portion of the other intruder's face. He described the individual as dark skinned with a scruffy goatee, and later identified Hernandez from a photographic array.

route to the apartment, Jamal and Hernandez informed Karon that they had been unable to steal anything. Jamal remarked that Hernandez was a good shot, and Hernandez responded, "Yeah, once I seen them jump on you, I just started shooting." Jamal returned the defendant's gun to him. Hernandez asked the defendant if he could leave his own gun at the defendant's apartment. When the defendant said no, Hernandez gave the gun to Hill, and told him to put it in the trunk of the Honda Civic. Jamal, Karon, and Hernandez removed the borrowed sweatshirts and left them in the defendant's living room.

Within an hour of the shootings, Lowell police spotted Hernandez driving the green Honda Civic that had been used in the earlier robbery. They stopped the vehicle, arrested Hernandez and Hill, and found the gun Hernandez had used in the shooting hidden in the trunk.

Detectives interviewed the defendant on October 24 and 25, 2009. He initially told police that he had purchased a .380 handgun "for protection," which he kept under his mattress. Eventually, the defendant admitted to having given this gun to Hernandez and the other men on the evening of the shootings. The defendant first said that he did not know what Hernandez and the other men were going to do with the gun. Eventually he stated that he believed they were going to rob someone, based on conversations that he overheard inside his apartment and the

fact that Hernandez had robbed two women earlier that evening.

b. _Prior proceedings_. The defendant was indicted on two counts charging murder in the first degree in the deaths of Hector and Tony Delgado, home invasion, unlawful possession of a firearm, and unlawful possession of ammunition. The defendant was tried before a Superior Court jury on the theory of felony-murder with the underlying offenses of attempted armed robbery and home invasion as the predicate felonies. The jury convicted the defendant on all charges.

2. _Discussion_. The defendant's primary argument on appeal is that the Commonwealth failed to produce sufficient evidence to prove that he participated in the underlying felonies, i.e., that he shared the intent of the other participants to commit an armed robbery. He also argues that the judge erroneously instructed the jury on the issues of shared intent and accomplice liability; portions of the prosecutor's opening statement and closing argument were improper; the judge abused her discretion by allowing the introduction of evidence of uncharged misconduct; and, during voir dire, the judge asked potential jurors an impermissible question. The defendant contends also that this court should abolish the felony-murder rule. In addition, he asks us to exercise our extraordinary authority under G. L. c. 278, § 33E, to reverse the murder convictions as against the weight of evidence. We address each

argument in turn.

a.  Sufficiency of the evidence.  In reviewing the denial
of a motion for a required finding of not guilty, we apply the
familiar Latimore standard.  See Commonwealth v. Latimore, 378
Mass. 671, 677-678 (1979).  "[The] question is whether, after
viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt."  Id.
at 677, quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979).
Under this standard of review, we resolve issues of witness
credibility in favor of the Commonwealth.  Commonwealth v.
Dilone, 385 Mass. 281, 286 (1982).  In determining whether a
reasonable jury could find each element of the crime charged, we
also do not weigh the supporting evidence against conflicting
evidence.  Commonwealth v. Lao, 443 Mass. 770, 779 (2005).

To convict the defendant of felony-murder on a theory of
accomplice liability, the Commonwealth was required to prove
beyond a reasonable doubt that the defendant knowingly
participated in the commission of one of the underlying
felonies, alone or with others, with the intent required for
that offense.[5]  Commonwealth v. Zanetti, 454 Mass. 449, 466

---

[5] As for the substantive offenses, to support a finding of
guilt of armed robbery requires proof that the defendant (or an
accomplice) while armed with a dangerous weapon assaulted the
victim and took money or property from the victim with the

(2009). See Commonwealth v. Silva, 471 Mass. 610, 621 (2015) (Commonwealth required to prove defendant's "knowing participation in some manner in the commission of the offense" together with shared intent); Commonwealth v. Akara, 465 Mass. 245, 253 (2013) (court considers whether defendant actively participated in events leading to victims' deaths); Marshall v. Commonwealth, 463 Mass. 529, 536-537 (2012) (conduct that historically had been described as accessory before fact "plainly falls under the rubric of accomplice liability"). In this case, where the predicate felonies were attempted armed robbery and armed home invasion, the Commonwealth also was required to prove that the defendant knew that one of his accomplices possessed a firearm. Commonwealth v. Garcia, 470 Mass. 24, 31 (2014).

Knowing participation in a criminal offense "may take any of several forms," and includes providing "aid or assistance in committing the crime." Zanetti, 454 Mass. at 470 (Appendix). To establish guilt on a theory of accomplice liability, the

---

intent (or shared intent) to steal it. Commonwealth v. Williams, 475 Mass. 705, 710 (2016). An attempt is defined as: (1) an intent to commit the underlying crime; (2) an overt act towards its commission, and (3) nonachievement of the substantive crime. Commonwealth v. Van Bell, 455 Mass. 408, 412 (2009). To prove armed home invasion, the Commonwealth must establish that the defendant (or his accomplice) entered a dwelling, while armed with a dangerous weapon, and "use[d] force or threaten[ed] the imminent use of force upon any person within such dwelling." Commonwealth v. Bois, 476 Mass. 15, 29 (2016), quoting G. L. c. 265, § 18C.

Commonwealth is not required to prove that a defendant was physically present at the scene of the offense. Commonwealth v. Ortiz, 424 Mass. 853, 858-859 (1997). A defendant may be convicted as a coventurer when he or she is not present at the scene of a crime "so long as the jury [find] [that the defendant] had actually associated [himself or herself] with the criminal venture and assisted in making it a success." Commonwealth v. Silanskas, 433 Mass. 678, 690 n.13 (2001), quoting Ortiz, supra. See Commonwealth v. Hanright, 466 Mass. 303, 310 (2013) ("[C]omplicity in the underlying felony is sufficient to establish guilt of [felony-murder] if the homicide followed naturally and probably from the carrying out of the joint enterprise" [citation omitted]); Commonwealth v. Benitez, 464 Mass. 686, 690 n.6 (2013) ("a person need not be physically present at the scene of the crime in order to participate as a joint venturer").

We do not agree with the defendant's contention that the evidence, at best, established that he was present inside an apartment where others planned a robbery, and that his mere "acquiescence in a request to produce clothing or a firearm does not confer joint venture liability." There was sufficient evidence from which a reasonable jury could have found beyond a reasonable doubt that the defendant knowingly participated in the predicate felonies. He was present in his apartment when

Jamal and Karon openly solicited others to help rob "the pretty big" "Puerto Rican guy." Hernandez agreed to join the robbery, announced that he would use his own gun, and retrieved it from its hiding place inside the defendant's kitchen cabinet. Jamal then asked to borrow the defendant's gun. The defendant expressed concern over the possibility that something would happen to it. Karon and Hernandez urged the defendant to lend the gun to Jamal, assuring him, "Nothing is going to happen to it." The defendant agreed and gave Jamal the gun.

In his statement to police, the defendant admitted that he gave the gun to Hernandez and the other men knowing that it was going to be used in a robbery. See Benitez, 464 Mass. at 690 (act of providing accomplice with gun supports finding that defendant knowingly and actively participated in armed robbery); Commonwealth v. Melton, 436 Mass. 291, 301 (2002) (defendant's participation in joint venture supported by evidence that he supplied firearm to shooter). See also Commonwealth v. Gunter, 427 Mass. 259, 261, 265 (1998) (defendant who remained in vehicle while his accomplices entered apartment and robbed rival drug dealers actively participated in felony-murder). The jury also reasonably could have found that the defendant gave hooded sweatshirts to his accomplices to help them avoid detection. Prior to the robbery, Hernandez asked the defendant for a hooded sweatshirt so that he could "hide his face." The defendant

provided Hernandez with a hooded sweatshirt with a front zipper. When Hernandez complained that the zipper was broken, and that some part of his shirt would be visible, the defendant gave him a pullover-style hooded sweatshirt. Jamal and Karon also borrowed hooded sweatshirts from the defendant. After the robbery, Hernandez, Karon, and Jamal drove directly to the defendant's apartment and returned the sweatshirts to him rather than wearing them in public.

It is also reasonable to infer that the instruments supplied by the defendant played an important role in the underlying crimes of attempted armed robbery and home invasion. Jamal, armed with the defendant's pistol, forced his way into the Delgados' townhouse. See Commonwealth v. Netto, 438 Mass. 686, 702-703 (2003) (circumstances may dictate that weapon is necessary to overcome anticipated resistance from victims). Once inside, Jamal used the gun to threaten Tony and demand money and drugs. Further, the hooded sweatshirts provided by the defendant hindered the ability of the other occupants of the townhouse to identify the intruders.

We conclude, therefore, that the jury reasonably could have found that the defendant was an active participant in the commission of the underlying felonies.

b. Jury instructions. The defendant contends that three of the judge's instructions concerning shared intent and

accomplice liability were erroneous.  First, he argues that the judge's instruction on intent and shared intent shifted the burden of proof by imposing a "mandatory rebuttable presumption," which instructed the jury that the defendant's conduct "necessarily indicated [his] knowledge and support of every aspect of criminal conduct that occurred."  Second, he argues that it was error for the judge to refer to the theory of accomplice liability while instructing on the substantive felony charges.  Third, he argues that the judge misstated the burden of proof.  Because there was no objection to these instructions, we review these claims to determine whether there was error and, if so, whether it created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Wright, 411 Mass. 678, 681 (1992).

We turn first to the defendant's argument that the instruction on intent impermissibly shifted the Commonwealth's burden of proof to him.  The defendant characterizes the following jury instructions as having created an impermissible "mandatory rebuttable presumption":

> "[Y]ou may determine the defendant's intent from any statement or act committed or omitted and from all the other circumstances that indicate a state of mind provided first you find that any or all such circumstances occurred.

> "Now, the jury may but not need necessarily infer from the conduct of a person that he intended the natural and probabl[e] consequences of his own acts.

"   . . .

"[T]he Commonwealth must also prove beyond a reasonable doubt that at the time the defendant knowingly participated in the commission of the crime and, as I've indicated, the felonies involved are attempted armed robbery and home invasion, that he possessed or shared the intent required for that crime.  And when I define the essential elements, I'm going to be telling you what the intent is.  You're permitted but not required to infer the defendant's mental state or intent, from his knowledge of the circumstances and any subsequent participation in the crime.  The inferences you draw must be reasonable and you may rely upon your experience and common sense in determining the defendant's knowledge or intent."

The due process clause of the Fourteenth Amendment to the United States Constitution requires the Commonwealth to prove every essential element of the offense beyond a reasonable doubt.  Matter of Winship, 397 U.S. 358, 364 (1970).  "Instructions to the jury that would lead them to believe otherwise are constitutional error."  Commonwealth v. Cruz, 456 Mass. 741, 752 (2010), citing Sandstrom v. Montana, 442 U.S. 510, 521 (1979).  See Francis v. Franklin, 471 U.S. 307, 313 (1985) (due process clause prohibits use of evidentiary presumption that relieves government of its burden).  An instruction that the jury reasonably could have interpreted as a mandatory presumption violates due process and cannot stand.  See DeJoinville v. Commonwealth, 381 Mass. 246, 252 (1980).  By contrast, there is no constitutional infirmity where a jury instruction creates only a permissive inference.  Id. at 253.  See Commonwealth v. Ely, 388 Mass. 69, 76 (1983) (permissive

inference that allows jury to infer elemental fact from proof by prosecutor of another fact does not shift burden of proof).

As the United States Supreme Court noted in Francis, 471 U.S. at 313, the analysis is relatively straightforward -- a reviewing court must determine whether the challenged portion of an instruction created an unconstitutional mandatory presumption or merely a permissive inference.  In this case, we conclude that the instructions on intent created permissive inferences. The judge did not instruct the jury that they were to presume that certain facts were proved, or that they were required to reach a particular conclusion.  Compare id. at 316 (instruction that person of sound mind and discretion is presumed to intend natural and probable consequences of his or her actions is mandatory presumption "cast in the language of command"); Commonwealth v. Nolin, 448 Mass. 207, 217-218 (2007) (instruction that person is presumed to intend natural and probable consequences of his or her acts improperly shifts burden of proof to defendant).

To the contrary, here, rather than being "cast in the language of command," the challenged instructions were permissive.  The judge instructed that intent and knowledge ordinarily cannot be proved by direct evidence, and then added, "[Y]ou may determine the defendant's intent from any statement or act committed or omitted and from all the other circumstances

that indicate a state of mind provided first you find that any or all such circumstances occurred" (emphasis supplied). She then continued, "[T]he jury may but not need necessarily infer from the conduct of a person that he intended the natural and probabl[e] consequences of his own acts" (emphasis supplied). The judge instructed as follows on shared intent: "You're permitted but not required to infer the defendant's mental state or intent, from his knowledge of the circumstances and any subsequent participation in the crime" (emphasis supplied). See Hill v. Maloney, 927 F.2d 646, 651 (1st Cir. 1990) (words "you may infer" clearly indicated that inferences of malice and intent were permissive).

Such permissive intent instructions do not run up against a defendant's right to due process. See Commonwealth v. Van Winkle, 443 Mass. 230, 239 (2005) (no error in instruction that "jury may infer, though it is not required to do so, that a person intends the natural and probable consequences of an act that is knowingly done"); Ely, 388 Mass. at 76 (instruction that permits, but does not require, jury to infer intent does not violate due process). Indeed, the inferences on permissive intent also are included in the model jury instructions on homicide, explaining shared intent: "You are permitted, but not required, to infer the defendant's mental state or intent from his [or her] knowledge of the circumstances or any subsequent

participation in the crime."  Model Jury Instructions on Homicide 15 (2013).  A similar instruction is included in the instruction concerning the intentional use of a dangerous weapon:  "As a general rule, you are permitted (but not required) to infer that a person who intentionally uses a dangerous weapon on another person intends to kill that person . . . ."  Id. at 92.

The defendant argues that the judge's instructions on attempted armed robbery and home invasion were erroneous because she improperly linked the phrase "aider and abettor" with the definition of the elements of the underlying offenses.  The defendant contends that "[t]hese instructions were confusing and implied that the jury should presume that the defendant was an aider and abettor, with the requisite knowledge and intent pertaining to home invasion and attempted armed robbery."  There was no error.

Before defining the elements of each underlying offense, the judge explained, "[W]henever I say the defendant, I always mean as an aider or abettor or a joint venturer."[6]  In Zanetti,

_____

[6] For example, at the beginning of her instructions on home invasion, the judge explained:

"To prove the defendant guilty of the crime of home invasion, the Commonwealth must convince you the jury of four elements beyond a reasonable doubt.  That the defendant as an aider and abettor unlawfully entered the dwelling house of another.  In other words, he doesn't have

454 Mass. at 468 n.22, we recommended that judges incorporate the concept of accessory liability within their instructions on substantive offenses. Here, the judge properly and consistently instructed the jury that the Commonwealth bore the burden to prove that the defendant knowingly participated in the predicate offense, with the requisite shared intent.

In his third claim of error in the instructions, the defendant argues that the judge made a misstatement at the end of her instructions on the predicate offenses, when she said, "If after your consideration of all the evidence you find the Commonwealth has not proven any one of these elements beyond a reasonable doubt you must find the defendant guilty of murder in the first degree." This misstatement was a clear slip of the tongue that went unnoticed by the judge and by the attorneys. Throughout her comprehensive charge, the judge properly instructed the jury on the presumption of innocence and the Commonwealth's burden of proving each essential element of the offense beyond a reasonable doubt. Thus, the misstatement was isolated, and did not result in a substantial likelihood of a miscarriage of justice. See Commonwealth v. Oliveira, 445 Mass. 837, 844-845 (2006).

    c. Prosecutor's opening statement and closing argument.

---

to physically go there himself if he aided/abetted the entry."

The defendant maintains that the prosecutor misstated the evidence, both in her opening statement and in her closing argument.  For instance, the defendant points to the prosecutor's asserted improper argument that the defendant "planned and executed" the attempted armed robbery and the home invasion.  The defendant contends that the prosecutor misstated the evidence by arguing that "but for" the defendant's participation, the crimes would not have occurred.

We begin with the prosecutor's opening statement.  Because defense counsel timely objected, we review for prejudicial error.  See Commonwealth v. Santiago, 425 Mass. 491, 500 (1997).

The purpose of an opening statement is to "outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence" (citation omitted).  Commonwealth v. Fazio, 375 Mass. 451, 454 (1978).  Here, the prosecutor's opening statement did not exceed the bounds of propriety.  She used a sports analogy to explain the Commonwealth's theory of the case, stating that the defendant had been part of a team that planned and executed a botched home invasion.  She emphasized that each team member played a particular role, and that the defendant contributed to the team effort by supplying a firearm and some clothing needed for disguise.  The prosecutor also argued that the team effort ultimately resulted in the deaths of the Delgado brothers.  The

prosecutor's characterization of the defendant's role in the shootings as the person who allegedly provided "that .380 gun and hoodies to the team" did not misstate the evidence.

The defendant raises a similar argument with respect to the prosecutor's closing, which carried on the sports analogy. Since trial counsel did not object, we consider whether any of the challenged statements was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Penn, 472 Mass. 610, 626-627 (2015), cert. denied, 136 S. Ct. 1656 (2016).

In closing, the prosecutor urged the jury to draw an inference, based on the evidence, that the defendant knew about the intended robbery and was an active participant in it. She pointed out that the defendant was aware that Hernandez had robbed two women earlier in the evening, the defendant was present when the men discussed robbing the two victims, and he knew that Hernandez would be bringing his gun to the robbery. The prosecutor described the defendant's role as providing "the tools to the rest of the team to effectuate this armed robbery and home invasion." This was not beyond the bounds of permissible advocacy.

The defendant contends also that a portion of the prosecutor's closing argument misstated the evidence. While discussing Hernandez's attempt to hide his gun in the

defendant's apartment after the attempted robbery, the prosecutor said the defendant "knew that that gun was just used in a crime.  The crime that he helped plan."  The defendant maintains that this statement "reiterated the false theme that [he] was a planner whose role was critical."  In the context of the closing argument as a whole, however, see Commonwealth v. Foxworth, 473 Mass. 149, 161 (2015), this isolated statement was unlikely to have prejudiced the defendant.  Throughout the trial, the prosecutor clearly proceeded on the theory that the defendant was liable because he had supplied necessary instruments that facilitated the commission of the underlying felonies, just as she presented his role on the "team" in her opening statement.[7]

d.  Evidence of uncharged prior misconduct.  The defendant maintains that the judge abused her discretion in allowing the introduction of evidence of the prior armed robbery, as well as photographs showing the defendant and an accomplice brandishing handguns.  The defendant argues that this evidence "overwhelmed" the case with unfair prejudice.  This argument is unavailing.

---

[7] The defendant also argues that the prosecutor misstated the evidence by arguing that Jamal entered the townhouse because he was armed with the defendant's pistol; Hernandez participated in the robbery because he wore a hoodie supplied by the defendant; and nobody would have entered the townhouse unless the defendant had supplied a firearm and disguises.  There was no error.  The Commonwealth was entitled to analyze the evidence and suggest reasonable inferences that the jury could draw from that evidence.  Commonwealth v. Cole, 473 Mass. 317, 333 (2015).

Evidence of a defendant's prior or subsequent bad acts is not admissible to show "bad character or criminal propensity." Commonwealth v. Lally, 473 Mass. 693, 712 (2016).  It may be admissible, however, where it is relevant for another purpose, such as to establish a "common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." Commonwealth v. Helfant, 398 Mass. 214, 224-225 (1986).  We review questions of admissibility, probative value, and unfair prejudice for abuse of discretion, id. at 229, and do not disturb a trial judge's decision absent a clear error of judgment in weighing the relevant factors.  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  In deciding whether to allow the admission of such evidence, a judge must decide whether the probative value of the evidence is outweighed by the risk of unfair prejudice to the defendant.  See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014).

In the circumstances here, the judge did not abuse her discretion in allowing the introduction of evidence concerning the armed robbery earlier in the afternoon on the day of the killing, while the defendant waited in the vehicle; such evidence was probative of Hernandez's intent to rob the Delgado brothers, and the defendant's shared intent to participate in that crime by supplying the guns and the means for potential disguise.  Indeed, in his statement to police, the defendant

admitted that, as a result of the earlier robbery, he believed Hernandez and the others intended to commit another armed robbery at the time he handed them his gun.

We also discern no error in the introduction of the photographs showing the defendant brandishing his gun. The photographs were introduced to establish his access to a weapon that was used in the commission of the underlying felonies -- the armed home invasion and the attempted armed robbery. See Commonwealth v. Corliss, 470 Mass. 443, 450 (2015) (judge has discretion to admit evidence that defendant previously possessed weapon that could have been used to commit crime); Commonwealth v. Tassinari, 466 Mass. 340, 353 (2013) (information about defendant's possession of firearms admissible where connected to commission of crime). The photographs, which were taken a few weeks before the shootings, showed the defendant and Hernandez displaying their respective weapons. Because both guns were introduced in evidence, the prejudicial impact of the photographs was minimal.

e. Jury voir dire. During a pretrial hearing, the judge informed counsel that she intended to ask the venire a question concerning joint venture liability. Defense counsel responded, "Yes, I think that would be fine, Judge." At trial, the judge asked potential jurors, "Is there anything about the concept of aiding and abetting that would prohibit your ability to listen

and apply the law as I will explain it to you at the conclusion of the trial and be a fair and impartial juror?"  The defendant did not object.

On appeal, the defendant contends that this question reduced the Commonwealth's burden of proof and "ensur[ed] a jury predisposed to find [him] guilty."  Because the issue is unpreserved, we review to determine whether asking the question was erroneous and, if so, whether it created a substantial likelihood of a miscarriage of justice.  Wright, 411 Mass. at 681.

During jury selection, a judge is required to "examine jurors fully regarding possible bias or prejudice where 'it appears that there is a substantial risk that jurors may be influenced by factors extraneous to the evidence presented to them.'"  Commonwealth v. Perez, 460 Mass. 683, 688 (2011), quoting Commonwealth v. Garuti, 454 Mass. 48, 52 (2009).  The judge may ask questions designed to "determine whether jurors [can] set aside their own opinions, weigh the evidence . . . , and follow the instructions of the judge."  Commonwealth v. Bryant, 447 Mass. 494, 501 (2006), quoting Commonwealth v. Leahy, 445 Mass. 481, 495 (2005).  The scope of jury voir dire is committed to the judge's sound discretion, and we will uphold the judge's questioning "absent a clear showing of abuse of discretion."  Commonwealth v. Gray, 465 Mass. 330, 338 (2013),

quoting Perez, supra at 689, and cases cited.

We do not share the defendant's view that the disputed question predisposed the jury to convict the defendant. A question may not be introduced if it "commit[ted] the jury to a verdict in advance" or "[had] the effect of identifying and selecting jurors who were predisposed to convicting the defendant based on evidence the Commonwealth would present." Gray, 465 Mass. at 339, quoting Perez, 460 Mass. at 691. Here, the judge sought to identify jurors who were unwilling or unable to follow her instructions regarding accomplice liability. Indeed, one potential juror reported, "I have more qualms about aiding and abetting being charged as a murder case." That juror was excused without objection.

At the beginning of jury selection, the judge provided the members of the venire with a preliminary instruction that the Commonwealth was required to prove each essential element of the offense beyond a reasonable doubt. In addition, the judge instructed that it was the Commonwealth's burden to prove joint venture liability by establishing that the defendant knowingly participated in the commission of the crime with the requisite intent to commit that crime. After jury selection, the judge properly instructed the seated jury a number of times that, in order for them to find the defendant guilty of felony-murder, the Commonwealth was required to prove that the defendant aided

and abetted at least one of the underlying felonies.  See
Commonwealth v. Gray, 465 Mass. at 341 (court considers issues
raised by question to venire in context with judge's conduct of
entire empanelment and judge's legal instructions on topic).  We
conclude that the judge had discretion to ask the venire a
question regarding their ability to follow her legal
instructions, and that the defendant has failed to demonstrate a
substantial likelihood of a miscarriage of justice.

f.  Abolition of the felony-murder rule.  The felony-murder
rule "imposes criminal liability for homicide on all
participants in a certain common criminal enterprise if a death
occurred in the course of that enterprise."  Hanright, 466 Mass.
at 307, quoting Commonwealth v. Matchett, 386 Mass. 492, 502
(1982).  The defendant invites the court to abolish the felony-
murder rule, arguing that it is arbitrary and unjust, and in
violation of art. 12 of the Massachusetts Declaration of Rights.
According to the defendant, the imposition of felony-murder
liability is contrary to the fundamental notion that an
individual is culpable for his or her own misconduct.

Felony-murder is a common-law crime.[8]  See Matchett, 386

---

[8] Felony-murder also falls within the province of G. L.
c. 265, § 1, which establishes two degrees of murder.  That
statute provides:  "Murder committed with deliberately
premeditated malice aforethought, or with extreme atrocity or
cruelty, or in the commission or attempted commission of a crime
punishable with death or imprisonment for life, is murder in the

Mass. at 502. The felony-murder rule imposes criminal liability "on all participants in a certain common criminal enterprise if a death occurred in the course of that enterprise." Commonwealth v. Watkins, 375 Mass. 472, 486 (1978). "'The effect of the felony-murder rule,' both for principals and accomplices, 'is to substitute the intent to commit the underlying felony for the malice aforethought required for murder.'" Hanright, 466 Mass. at 307, quoting Matchett, supra.

We consistently have rejected the argument that the felony-murder rule is unconstitutional, see Commonwealth v. Moran, 387 Mass. 644, 649-650 (1982), and Watkins, 375 Mass. at 486-487, or that it relieves the Commonwealth of its obligation to prove a defendant's own moral culpability. See Hanright, 466 Mass. at 307-310; Commonwealth v. Richards, 363 Mass. 299, 307 (1973) ("A broad conception of complicity is indeed at work in the special field of so called felony-murder . . .").

More recently, in Commonwealth v. Tejeda, 473 Mass. 269, 277 (2015), we considered the continued viability of the common-law felony-murder rule, but did not reach the issue. Discussing the scope of vicarious liability, we noted that felony-murder is

first degree. Murder which does not appear to be in the first degree is murder in the second degree." General Laws c. 265, § 1, was enacted to "mitigate the harshness of the common law rule imposing a mandatory death penalty on all murderers." Commonwealth v. Paulding, 438 Mass. 1, 8 (2002), discussing Commonwealth v. Dickerson, 372 Mass. 783, 803-805 (1977) (Quirico, J., concurring).

an exception to the general rule that "[o]ne is punished for his own blameworthy conduct, not that of others" (citation omitted). Id. at 276.  Under the felony-murder rule, "a person who knowingly participates in one crime as part of a joint venture is 'ipso facto also guilty' of [murder] committed by an accomplice in furtherance of the joint venture."  Id.  We discern no reason to deviate from our decisions in Moran and Watkins, and to accept the defendant's invitation that we abolish the felony-murder rule.

g.  Review under G. L. c. 278, § 33E.  The defendant asks also that we exercise our authority under G. L. c. 278, § 33E, to grant him a new trial because the felony-murder verdicts, "as indicated by the prosecutor's reliance on innuendo and misrepresentation," were against the weight of the evidence.  We have carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and conclude that the verdicts of felony-murder were neither contrary to our joint venture felony-murder jurisprudence nor against the weight of the evidence.

Our authority under G. L. c. 278, § 33E, however, also requires us to consider whether the convictions of murder in the first degree are consonant with justice.  Commonwealth v. Gould, 380 Mass. 672, 680 (1980).  "If upon our examination of the facts, we should, in our discretion, be of [the] opinion that there was a miscarriage of justice in convicting the defendant

of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare." Commonwealth v. Baker, 346 Mass. 107, 109 (1963). The authority granted us under G. L. c. 278, § 33E, includes the discretion to reduce a conviction of felony-murder in the first degree in circumstances where the jury do not have that option. Commonwealth v. Paulding, 438 Mass. 1, 10 (2002) (it is left to court's authority under G. L. c. 278, § 33E, and is not within jury's role in reaching verdict, to reduce felony-murder in first degree to felony-murder in second degree).

We are cognizant that the court's authority under G. L. c. 278, § 33E, should be used sparingly and with restraint. See Commonwealth v. Lannon, 364 Mass. 480, 486 (1974). The court does not serve as a second jury. Commonwealth v. Prendergast, 385 Mass. 625, 638 (1982). Moreover, the doctrines of felony-murder and joint venture liability "are well established and should not be undermined on an ad hoc basis." Commonwealth v. Hooks, 375 Mass. 284, 298 (1978).

Nonetheless, we have recognized that "the doctrines of felony-murder and joint venture may, on some hypothetical fact patterns, produce a conviction of murder in the first degree that would appear out of proportion to a defendant's culpability." Commonwealth v. Rolon, 438 Mass. 808, 824 (2003).

Here, by contrast, the defendant was involved in the "remote outer fringes" of the attempted armed robbery and armed home invasion. See id. As discussed, the defendant should be held liable for felony-murder as a supplier of a firearm and clothing utilized by his cohorts in the commission of the underlying felonies. Having carefully reviewed the facts and circumstances of this case, we conclude that the defendant's conduct, as an individual who participated on the "remote outer fringes" of the joint venture, makes verdicts of murder in the second degree more consonant with justice.

4. Conclusion. The verdicts of murder in the first degree and the sentences imposed are vacated and set aside. The matter is remanded to the Superior Court where verdicts of guilty of murder in the second degree are to be entered, and the defendant is to be sentenced accordingly. The defendant's remaining convictions are affirmed.

So ordered.

GANTS, C.J. (concurring, with whom Lenk, Hines, and Budd, JJ., join). I agree with the court that, where the defendant's only participation in the crimes was to provide a firearm and hooded sweatshirts to his friends, knowing they intended to use them in the commission of an armed robbery, convictions of murder in the first degree on the theory of felony-murder are not consonant with justice. I write separately to explore how our common law of felony-murder led to convictions of murder in the first degree that are not consonant with justice, and to explain why it is time for us to narrow the scope of liability for that common-law crime. I believe that, in the future, a defendant should not be convicted of murder without proof of one of the three prongs of malice: that he or she intended to kill or to cause grievous bodily harm, or intended to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result. I also believe that we should abandon the fiction of constructive malice -- that where a killing occurs in the commission of a felony, the intent to commit the felony is sufficient alone to establish malice.

As noted in the opinion of the court, following the issuance of this concurring opinion, which is joined by three other Justices, a conviction of felony-murder will require a finding of actual malice, not merely constructive malice. As a

result, felony-murder will no longer be an independent theory of liability for murder. Rather, felony-murder will be limited to its statutory role under G. L. c. 265, § 1, as an aggravating element of murder, permitting a jury to find a defendant guilty of murder in the first degree where the murder was neither premeditated nor committed with extreme atrocity or cruelty but was committed in the course of a felony punishable by life imprisonment.

The court correctly concludes that, under our existing common law, the defendant committed felony-murder in the first degree: he knowingly aided and abetted the commission of a life felony (attempted armed robbery and home invasion), in which his accomplices killed two victims. Under our existing common law of felony-murder, it is legally irrelevant that the defendant was not present at the scene of the attempted armed robbery; he is criminally responsible for every act resulting in death committed by his accomplices during the attempted commission of the armed robbery. See Commonwealth v. Tejeda, 473 Mass. 269, 272 (2015). It is also legally irrelevant that he did not share his accomplices' intent to kill or to cause grievous bodily harm during the attempt; his intent to commit the armed robbery substitutes for the malice aforethought generally required for murder. Id. Because the underlying crimes were both felonies punishable by life in prison, the jury properly were not

instructed on felony-murder in the second degree, because the evidence did not permit such a verdict.  See Commonwealth v. Paulding, 438 Mass. 1, 10 (2002).  In short, under our existing common law of felony-murder, the jury reached the correct verdicts.  Indeed, guilty verdicts of murder in the first degree on the theory of felony-murder are the only verdicts they reasonably could have reached on this evidence.  It is not the fault of the jury that the verdicts they reached are not consonant with justice; it is the fault of our common law of felony-murder.[1]

---

[1] It should not escape notice that this is the first time we have exercised our authority under G. L. c. 278, § 33E, to reduce a conviction of murder in the first degree on the theory of felony-murder to murder in the second degree where the evidence more than sufficed to support the verdict.  See Commonwealth v. Rolon, 438 Mass. 808, 824 n.19 (2003) ("This court has reduced convictions of murder in the first degree predicated on felony-murder only where the evidence suggested that the felony intended by the defendant would not suffice for felony-murder in the first degree").  Until now, "[t]his court's power under G. L. c. 278, § 33E, has never been exercised to relieve a defendant of the consequences of participation in a felony that does qualify as the predicate for felony-murder in the first degree."  Id.  In Rolon, we declared:

> "We recognize that the doctrines of felony-murder and joint venture may, on some hypothetical fact patterns, produce a conviction of murder in the first degree that would appear out of proportion to a defendant's culpability.  It may in some circumstances seem harsh to convict a defendant of murder in the first degree if the defendant was on the remote outer fringes of a joint venture to commit some felony that satisfied the felony-murder rule in only some hypertechnical way."

We have long recognized that "[t]he common law felony-murder rule is of questionable origin." <u>Commonwealth</u> v. <u>Matchett</u>, 386 Mass. 492, 503 n.12 (1982). A look at the early English law reveals that there was no precedent in English cases for what we now refer to as "felony-murder." Professor Guyora Binder, in an exhaustive analysis of the origins of American felony-murder rules, concluded:

> "By the time of the American Revolution, the rule that an accidental death in the course of any felony was murder had become a standard theme in scholarly writing about the common law of homicide . . . . Yet no English court had ever actually applied such a rule. . . . By the end of the eighteenth century, some judges thought cofelons were automatically implicated in any murder committed in attempt of a felony, but most judges required participation in or encouragement of the act causing death."

Binder, The Origins of American Felony Murder Rules, 57 Stan. L. Rev. 59, 98 (2004). An analysis of early American cases leads to a similar conclusion -- in most instances murder liability was imposed only where there was independent proof of malice. See <u>id</u>. at 193-194.

---

<u>Id</u>. at 824. But in <u>Rolon</u> we simply assumed, "without deciding, that reduction of a verdict in such circumstances could be appropriate under [Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995)]." <u>Id</u>. We did not need to decide that issue because we determined that the case did "not present such circumstances." <u>Id</u>. Here, it is not accurate to say that the defendant's conduct constituted felony-murder "in only some hypertechnical way." However, the court correctly recognizes that a conviction of murder in the first degree, with its mandatory sentence of life in prison without the possibility of parole, is not consonant with justice where the defendant's role was limited to providing a firearm and hooded sweatshirts to his accomplices for the commission of an armed robbery.

The absence of any clear preexisting concept of "felony-murder" also becomes evident when examining the provenance of the Massachusetts murder statute.  In 1784, Massachusetts enacted a statute providing "[t]hat whosoever shall commit wilful murder, of malice aforethought, . . . shall suffer the pains of death."  St. 1784, c. 44.  It was only in 1858 that the Massachusetts Legislature established two degrees of murder, and provided that the degree of murder is to be found by the jury.  St. 1858, c. 154, §§ 1, 2.  "The legislative documents that precede the enactment of St. 1858, c. 154, suggest that murder was divided into degrees largely to mitigate the harshness of the common law rule imposing a mandatory death penalty on all murderers."  Commonwealth v. Dickerson, 372 Mass. 783, 803 (1977) (Quirico, J., concurring).  Murder in the first degree, punishable by death, was defined as "[m]urder, committed with deliberately premeditated malice aforethought, or in the commission of an attempt to commit any crime punishable with imprisonment for life, or committed with extreme atrocity or cruelty."  St. 1858, c. 154, § 1.  This statute is described by Professor Binder as a "felony aggravator statute," in that it provided that where a defendant committed "murder" and where that murder was committed in the attempt to commit a life felony, the murder was murder in the first degree regardless of whether it was premeditated or committed with extreme atrocity

or cruelty.  See Binder, supra at 120.  The statute did not define "murder" and did not declare that a person is guilty of murder whenever a death occurs during the commission of a felony; the elements of murder liability continued to rest in the domain of the common law.  See People v. Aaron, 409 Mich. 672, 721 (1980) ("[t]he use of the term 'murder' in the first-degree statute requires that a murder must first be established before the statute is applied to elevate the degree").

It is not surprising that the first Massachusetts statute that refers to murder in the commission of a felony treated it simply as an aggravating element that made the murder worthy of the death penalty.  In the vast majority of the cases where a victim was killed during the commission of a felony, the defendant had killed the victim in furtherance of the crime or to facilitate his or her escape, and intended to kill or to commit grievous bodily harm, so there was no need for a distinct theory of felony-murder that substituted the intent to commit the underlying felony for the malice necessary for a murder conviction.  In these cases, the killing already met the definition of murder.  See Binder, supra at 65-66.  Nor is it surprising that this statute included only "an attempt to commit any crime punishable with imprisonment for life," rather than

the commission of a completed crime.[2]  The law of attempt during this time period was still evolving, and felony-murder was a means to ensure that the attempt was appropriately punished where it resulted in death.  Id. at 92.

The first Supreme Judicial Court case that specifically addressed the issue of liability for a death occurring during the commission of a felony (felony-murder liability[3]) was issued in 1863, five years after the enactment of the statute.  See Commonwealth v. Campbell, 7 Allen 541 (1863).  In Campbell, a man was killed by a gun shot during a draft riot but it was not clear whether the shot was fired by a rioter or by a soldier who was defending the armory from the rioters.  Id. at 541, 543. The court considered the prosecutor's request for a jury instruction declaring that, if the defendant was a participant in the riot, and if the homicide occurred during the attack on the armory, the defendant "is in law guilty of manslaughter" even if the evidence fails to show whether the shot was fired by a rioter or a soldier.  Id. at 543.  The court held that the

---

[2] The statute was revised in 1860 to include "[m]urder committed . . . in the commission of, or attempt to commit, any crime."  St. 1860, c. 160, § 1.

[3] In this opinion "felony-murder liability" refers to liability for murder absent independent proof of malice.  This is distinguishable from felony-murder as a statutory aggravator that merely elevates what would otherwise be murder in the second degree, based on proof of actual malice, to murder in the first degree where the killing occurred during the commission of a life felony -- the concept codified in G. L. c. 265, § 1.

jury should be instructed that the defendant is entitled to an acquittal unless the jury finds "beyond a reasonable doubt that the deceased was killed by means of a gun or other deadly weapon in the hands of the prisoner, or of one of the rioters with whom he was associated and acting."  Id. at 547-548.  The court reasoned that its conclusion flowed from the general rule of law "that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that, if he combines and confederates with others to accomplish an illegal purpose, he is liable [criminally] for the acts of each and all who participate with him in the execution of the unlawful design."  Id. at 543-544.  But he is not criminally liable for acts that are not "committed by his own hand or by some one acting in concert with him or in furtherance of a common object or purpose."  Id. at 544.

The Campbell opinion identifies two principles of law on which our common law of felony-murder liability rests that we reject elsewhere in our criminal jurisprudence:  vicarious substantive criminal liability for every act committed by a joint venturer, and the conclusive presumption of malice from the intent to commit an inherently dangerous felony.  See Tejeda, 473 Mass. at 276 ("the common law of felony-murder is an

exception to two basic principles of our criminal jurisprudence").  I discuss each in turn.

The first of these principles is the rule of law that a person engaged in a criminal joint venture is criminally liable for all of the acts of his or her accomplices committed in furtherance of the joint venture.  This rule was adopted by the United States Supreme Court in Pinkerton v. United States, 328 U.S. 640, 645-648 (1946), which held that a defendant may be found guilty of substantive offenses committed by his coconspirator in furtherance of the conspiracy, even if he did not participate directly in the commission of those substantive offenses.

We no longer adhere to this Pinkerton theory of accomplice liability.  See Commonwealth v. Stasiun, 349 Mass. 38, 47-49 (1965) ("To be liable for the substantive offence, a coconspirator must participate or aid in the commission of it").  We declared in Stasiun, supra at 48:

> "While it has been said that a conspiracy is a 'partnership in crime' (United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 253 [(1940)]), that metaphor should not be pressed too far.  It does not follow that such a partnership is governed by the same principles of vicarious liability as would apply in civil cases.  Our criminal law is founded on the principle that guilt, for the more serious offences, is personal, not vicarious.  One is punished for his own blameworthy conduct, not that of others.  Perkins on Criminal Law, 550 [(1957)]. Sayre, Criminal Responsibility for the Acts of Another, 43 Harv. L. Rev. 689 [(1930)]. . . .  To ignore the distinction between the crime of conspiracy and the substantive offence

would enable 'the government through the use of the conspiracy dragnet to convict a conspirator of every substantive offense committed by any other member of the group even though he had no part in it or even knowledge of it.' United States v. Sall, 116 F.2d 745, 748 (3d Cir. [1940])."

Under our common law of joint venture liability, a defendant is criminally responsible for a crime committed by an accomplice only where the defendant knowingly participates in the crime with the intent required to commit it. See Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009). But until now, we have retained one exception: under our common law of felony-murder, a defendant was still vicariously responsible for all the acts of his or her accomplices that resulted in death committed during the course of the felony. Tejeda, 473 Mass. at 275-276. The consequence of this exception was that, if an accomplice shot and killed a victim during the commission of an armed robbery, the defendant was guilty of felony-murder even if he or she sat outside in the getaway vehicle and had implored the accomplices to hurt no one in committing the crime. However, if the accomplice committed the same shooting but the victim survived, the defendant sitting in that getaway vehicle would have been guilty only of the underlying armed robbery, not of the shooting. "Only where a dangerous felony result[ed] in death [did] we adopt a principle that we otherwise [had] 'firmly rejected' -- that a person who knowingly participates in one

crime as part of a joint venture is "ipso facto also guilty" of all other crimes committed by an accomplice in furtherance of the joint venture."  Id., quoting Commonwealth v. Richards, 363 Mass. 299, 306 (1973).  See Commonwealth v. Hanright, 466 Mass. 303, 307-310 (2013), quoting 2 W.R. LaFave, Substantive Criminal Law § 13.3 (b), at 362-363 (2d ed. 2003) ("we remain committed to the view that . . . A's guilt as an accomplice to one crime should not per se be a basis for holding A accountable for a related crime merely because the latter offense was carried out by A's principal").

The second principle set forth in Campbell, 7 Allen at 543 -- "that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it" -- has evolved in our common law of felony-murder into a rule that, where a defendant commits an inherently dangerous felony, such as armed robbery, he or she is criminally responsible for the consequences of every act by a joint venturer during the commission of the felony where the consequence is death.  See Hanright, 466 Mass. at 307-310, citing Matchett, 386 Mass. at 502.  As a result of this rule, a defendant who participates in an armed robbery is guilty of felony-murder in the first degree if the defendant or an accomplice commits any act that results in death, even if the act is accidental and unintended.  As a result, although in

every other circumstance a killing constitutes murder only where it is committed with actual malice, where the killing occurs in the commission of an inherently dangerous felony, proof of actual malice is not required; a felony-murder conviction may rest on proof of constructive malice, which is defined simply as the intent to commit the underlying felony.

We have noted that, in this regard, our common law of felony-murder is an exception to our general rule that "we require proof of a defendant's intent to commit the crime charged, and do not conclusively presume such intent from the intent to commit another crime." Tejeda, 473 Mass. at 276. In fact, we have said, "A felony-murder rule that punishes all homicides committed in the perpetration of a felony whether the death is intentional, unintentional or accidental, without the necessity of proving the relation of the perpetrator's state of mind to the homicide, violates the most fundamental principle of the criminal law -- 'criminal liability for causing a particular result is not justified in the absence of some culpable mental state in respect to that result.'" Matchett, 386 Mass. at 506-507, quoting Aaron, 409 Mich. at 708.

The consequence of this exception to "the most fundamental principle of the criminal law" is that, if a defendant drops his or her firearm and accidentally shoots someone during the commission of a felony, the defendant is guilty of both the

underlying felony and felony-murder if the shooting proves fatal. But if the victim survives, the defendant is guilty only of the underlying felony, and is not criminally responsible for the shooting. The defendant's liability for the shooting rests, not on the defendant's conduct, but on whether the victim lives or dies. See, e.g., Hanright, 466 Mass. at 308-309 ("The intent to commit armed robbery, although sufficient to support liability for felony-murder on a theory of joint venture, is insufficient to support liability for" additional offenses against other, surviving police officers who attempted to apprehend accomplice); Richards, 363 Mass. at 302, 307-308 (defendant who was waiting near getaway vehicle in armed robbery may be found guilty of assault with intent to murder police officer committed by accomplice only if defendant had specific intent to kill police officer).

We have recognized that the application of the felony-murder rule erodes "the relation between criminal liability and moral culpability." Matchett, 386 Mass. at 507, quoting People v. Washington, 62 Cal. 2d 777, 783 (1965). It is time for us to eliminate the last vestige of these two abandoned principles and end their application in our common law of felony-murder. Doing so means that criminal liability for murder in the first or second degree will be predicated on proof that the defendant acted with malice or shared the intent of a joint venturer who

acted with malice.  The sole remaining function of felony-murder will be to elevate what would otherwise be murder in the second degree to murder in the first degree where the killing occurs during the commission of a life felony.[4]

Thus, a defendant who commits an armed robbery as a joint venturer will be found guilty of murder where a killing was committed in the course of that robbery if he or she knowingly participated in the killing with the intent required to commit it -- that is, with the intent either to kill, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result.  Model Jury Instructions on Homicide 57 & n.131 (2013), citing Commonwealth v. Earle, 458 Mass. 341, 346-347 & n.9, 350 (2010), and Commonwealth v. Grey, 399 Mass. 469, 470 n.1, 472 n.4 (1987).  Where a defendant participates in an armed robbery but does not have the requisite intent for murder, the defendant will be found guilty of involuntary manslaughter if he or she acted wantonly or recklessly.  Where a defendant does not participate in the killing or otherwise lacked the intent required to prove murder or manslaughter, the defendant will not go free because he or she can still be convicted of the underlying armed robbery

---

[4] This will entirely eliminate the concept of "felony-murder in the second degree."  See Model Jury Instructions on Homicide 58-63 (2013).

he or she committed, and a judge in setting the sentence on that underlying felony can take into account the aggravating factor that the felony resulted in a victim's death.  Where the defendant is found guilty of murder and the murder is committed "in the commission or attempted commission of a crime punishable with . . . imprisonment for life," the defendant will be guilty of murder in the first degree, regardless of whether the murder was premeditated or committed with extreme atrocity or cruelty. G. L. c. 265, § 1.

We are not the first to do this.  Great Britain has abolished felony-murder liability by statute, providing that "[w]here a person kills another in the course or furtherance of some other offence, the killing shall not amount to murder unless done with the same malice aforethought . . . as is required for a killing to amount to murder when not done in the course or furtherance of another offence."  Homicide Act of 1957, 5 & 6 Eliz. 2, c. 11, § 1.  See Tejeda, 473 Mass. at 277 n.9.  Michigan has abolished felony-murder liability under its common law, id., citing Aaron, 409 Mich. at 727-729, and Hawaii and Kentucky have abolished felony-murder liability by statute. Tejeda, supra, citing 7A Hawaii Rev. Stat. § 707-701 commentary, and Ky. Rev. Stat. Ann. § 507.020, 1974 commentary.  Other States have not abolished the doctrine but have significantly departed from the traditional formulation.  See Tejeda, supra,

citing State v. Doucette, 143 Vt. 573, 582 (1983) (holding that felony-murder requires proof of malice, but that malice can be inferred "from evidence presented that the defendant intentionally set in motion a chain of events likely to cause death or great bodily injury, or acted with extreme indifference to the value of human life"), Del. Code Ann. tit. 11, §§ 635, 636 (2007) (requiring defendant to act with recklessness, for murder in the first degree, or criminal negligence, for murder in the second degree), and N.Y. Penal Law §§ 125.25(3), 125.27 (McKinney 2009) (setting forth affirmative defense where joint venturer rather than defendant commits act causing death). The Model Penal Code also has abandoned the traditional doctrine of felony-murder, requiring the homicide to be purposeful, knowing, or reckless in order to constitute murder, but providing for a rebuttable presumption of recklessness where the homicide occurred during the commission of certain felonies. Model Penal Code §§ 1.12(5), 210.2(1)(b) (Official Draft and Revised Comments 1985). See Matchett, 386 Mass. at 503 n.12.

Without felony-murder liability, our common law of murder will be spared much of the confusion that has arisen from applying legal principles we have otherwise abandoned. General Laws c. 265, § 1, provides that "[t]he degree of murder shall be found by the jury," but we have held that this statutory directive cannot be met when a defendant is charged with felony-

murder and the only underlying felony is a life felony, because in such a case "no reasonable view of the evidence supports a conviction of murder in the second degree." See Paulding, 438 Mass. at 3. As a result, when a defendant fatally shoots a victim but does not do so during the commission of a felony, the jury must be given the option of finding the defendant guilty of murder in the second degree. But when a defendant, as in this case, provides a weapon and hooded sweatshirts to friends to help them commit what turns out to be a botched armed robbery, the jury is denied that option.

The abolition of felony-murder liability from our common law of murder is prospective, applying only to cases where trial begins after our adoption of the change. It will have no effect on felony-murder cases already tried, including this case (which is why this is a concurrence rather than a dissent). I recognize that a felony-murder case might have been tried very differently if the prosecutor had known that liability for murder would need to rest on proof of actual malice. For instance, a prosecutor might have asked for an involuntary manslaughter instruction if he or she had known that the jury could not rest a finding of murder on felony-murder liability.

Justice Gaziano's concurrence identifies various factual scenarios, some of which come from Massachusetts criminal cases, where a victim was killed during the commission of a felony.

See post at    .  Through these examples, that concurrence seeks to show, first, that a verdict of murder in the first degree would not be possible on these facts without felony-murder liability and, second, that any lesser conviction would not be consonant with justice.  See id.  In fact, the examples show that, without felony-murder liability, each of these cases could yields convictions that are entirely consonant with justice.

Without felony-murder liability, the rapist who smothers the child rape victim could be found guilty of murder with actual malice if a jury found, either from the violence of the rape or the smothering of the child, that the defendant had an intent to commit grievous bodily harm or intended to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result.  See post at    .  Had the jury been so instructed, Robert Wade, too, could have been found guilty of murder without felony-murder liability based on his rape of the eighty-three year old woman, his dragging her along a dirt road, and his violent assault on her body, which would more than suffice to support a finding of those two prongs of malice.  See id. at    ; Commonwealth v. Wade, 428 Mass. 147, 148-149, 153 (1998) (jury instructed only on felony-murder in first and second degree and manslaughter).  Had the jury found actual malice, each would have been convicted of murder in the first

degree under G. L. c. 265, § 1, because the murder was committed in the commission of a life felony.

The armed robbers who accidently discharged a fatal shot while vaulting over the counter or when struck by the victim's baseball bat likely could not be found guilty of murder in the first degree because their intent with respect to the killing probably did not satisfy any of the three prongs of malice. See id. at ; Commonwealth v. Vizcarrondo, 427 Mass. 392, 397 (1998). But they might be found guilty of involuntary manslaughter if the jury found that the death arose from their wanton or reckless conduct that created a high degree of likelihood that substantial harm will result to another person. See Model Jury Instructions on Homicide 73 & n.158 (2013), citing Commonwealth v. Earle, 458 Mass. 341, 347 (2010); Commonwealth v. Sneed, 413 Mass. 387, 393-394 (1992). And, even if the jury found that the death did not arise from their wanton or reckless conduct, they could still be sentenced to life in prison on the armed robbery conviction. See G. L. c. 265, § 17. Convictions of both armed robbery and involuntary manslaughter, or of armed robbery alone, with a possible sentence of life in prison, should not be perceived as "getting off easy" for an accidental killing during an armed robbery.[5]

---

[5] Justice Gaziano's concurrence correctly notes that this concurring opinion is in conflict with the reasoning in the

Felony-murder liability is a creation of our common law, and this court is responsible for the content of that common law. When our experience with the common law of felony-murder liability demonstrates that it can yield a verdict of murder in the first degree that is not consonant with justice, and where we recognize that it was derived from legal principles we no longer accept and contravenes two fundamental principles of our

court's unanimous opinion in Commonwealth v. Hanright, 466 Mass. 303 (2013), where we reversed the judge's dismissal of indictments charging crimes related to an accomplice's attempted escape following an armed robbery and shooting and so much of an indictment charging murder in the first degree as included theories other than felony-murder. Where that opinion discussed the distinction between joint venture liability for the escape-related crimes and the joint venture principles in the common law of felony-murder, I agree that the reasoning differs, but that reasoning was premised on principles that this concurring opinion changes. The reference to that case is apt, however, because its facts illustrate the need for this change in our jurisprudence if our law of homicide is to be more consonant with justice. Under our current law of felony-murder, Scott Hanright, who was nineteen years old at the time, could have been convicted of murder in the first degree, with a mandatory life sentence without the possibility of parole, if he were found to have served as an unarmed lookout or getaway driver during a department store robbery committed by his accomplice, who was his grandmother's boyfriend. Id. at 305-306. The accomplice killed a police officer who responded to the robbery; Hanright never entered the department store and, when he saw police officers pursuing his accomplice before the shooting, walked away from the scene of the crime. Id. at 306. The prosecutor ultimately did not seek a conviction of murder in the first degree; Hanright pleaded guilty to murder in the second degree. Man, 23, Guilty in Slaying of Officer, Boston Globe, May 28, 2015, at B1. A conviction of murder in the second degree would not have been legally possible except through our review under G. L. c. 278, § 33E, if Hanright had been found guilty of felony-murder in the first degree with armed robbery as the predicate felony.

criminal jurisprudence, we must revise that common law so that it accords with those fundamental principles and yields verdicts that are just and fair in light of the defendant's criminal conduct.  "And if not now, when?"  C. Taylor, Sayings of the Jewish Fathers 23 (2d ed. 1897) (quoting Hillel the Elder).

GAZIANO, J. (concurring, with whom Lowy and Cypher, JJ.,
join).  A rapist smothers a distraught child victim to silence
her sobbing.  To his surprise, the child dies.  An armed robber
enters a convenience store and threatens the store clerk with a
handgun.  The store clerk, frozen in fear, fails to comply with
his demands.  The frustrated armed robber vaults over the
counter to empty the cash register, and in the process
accidently discharges a fatal shot.  See Binder, The Culpability
of Felony Murder, 83 Notre Dame L. Rev. 965, 966 (2008) (Binder
I).  Neither of these offenders would be convicted of murder
under Chief Justice Gants's abrogated version of felony-murder.
In this view, charging the rapist and the armed robber with
murder would be unfair and unjust because each's criminal
liability is disconnected from moral culpability for the
respective crimes.  This approach, which is predicated on an
extremely narrow view of moral culpability (or blameworthiness),
diminishes the seriousness of violent felonies that result in
the deaths of innocent victims.[1]

---

[1] The concurring opinion by Chief Justice Gants relies on
Commonwealth v. Matchett, 386 Mass. 492, 507 (1982), in support
of the proposition that application of the felony-murder rule
erodes "the relation between criminal liability and moral
culpability."  Ante at    .  Prior to the decision in that case,
"a defendant could be found guilty of murder on a theory of
felony-murder if he or she committed a homicide while engaged in
the commission or attempted commission of a felony punishable by
life in prison."  Commonwealth v. Prater, 431 Mass. 86, 95
(2000).  In Matchett, supra, we addressed those concerns by

Although an offender's mental state is an important component of assessing blameworthiness, it is not "the only legitimate determinant of the grade of a homicide resulting from a felony."  Crump & Crump, In Defense of the Felony Murder Doctrine, 8 Harv. J.L. & Pub. Pol'y 359, 366 (1985) (Crump).  See Binder I, supra at 1059 (accurate assessment of culpability requires consideration of fatal result).  It is a fundamental tenet of criminal law that blameworthiness is premised on two factors, not just the offender's state of mind.  Commonwealth v. Lopez, 433 Mass. 722, 725 (2001), citing Morissette v. United States, 342 U.S. 246, 250 (1952).  A criminal defendant's blameworthiness depends on "a showing that the prohibited conduct (actus reus) was committed with the concomitant mental state (mens rea) prescribed for the offense."  Lopez, supra, citing Morissette, supra.  See Crump, supra at 362 ("Differences in result must be taken into account as part of actus reus if classification and grading are to be rational").  The actus reus component of a criminal offense refers to all of the physical elements of the crime, including the individual's offense conduct and the consequences of the act.  See Commonwealth v. Williams, 399 Mass. 60, 64-65 (1987).  See also Black's Law

---

narrowing the scope of the felony-murder rule to require that the Commonwealth prove that the underlying felony is either inherently dangerous to human life or was committed with a conscious disregard of the risk to human life.

Dictionary 44 (10th ed. 2014) (actus reus includes attendant circumstances and societal harm caused by criminal act, all of which make up physical components of offense).

The criminal law, in general, considers the harm caused by an individual in evaluating the severity of an offense. Binder, Making the Best of Felony Murder, 91 B.U. L. Rev. 403, 427 (2011) (Binder II) ("the evaluation of ends pervades American criminal law"). Chief Justice Gants's exclusive focus on the mens rea component of the crime ignores the human costs of an offender's actions, and overlooks numerous examples in the criminal law to the contrary. For example, it is a misdemeanor to drive a motor vehicle while under the influence of alcohol. See G. L. c. 90, § 24. If one intoxicated driver strikes and kills a pedestrian, whereas another manages to avoid any accident, the former offense is elevated to the serious felony of motor vehicle homicide. See G. L. c. 90, § 24G (a). A defendant who shoots and kills his or her intended target, and an individual who attempts to shoot someone, but misses, may share the same intent to kill, yet it is clear that they are not equally blameworthy. See Commonwealth v. LaBrie, 473 Mass. 754, 760 (2016) (discussing mens rea of attempted murder).

To provide needed context, I address several instances where blameworthy defendants, who did not kill intentionally or recklessly, were convicted of felony-murder in the first degree.

Each of these defendants would not be convicted of murder under Chief Justice Gants's reformulation of the felony-murder rule.

In October, 1993, a farmhand named Robert Wade abducted the farm owner's eighty-three year old mother from her house. Wade dragged the victim, who suffered from Alzheimer's disease, along a dirt road to the shack where he lived. Commonwealth v. Wade, 428 Mass. 147, 147-149 (1998). In the process, the victim's shoulders, knees, and buttocks were badly scraped, and gravel was embedded in the torn tissue of her back. Id. at 149. Wade brutally raped her. Id. at 148. "The victim's clothing [was] torn and was covered with human blood. She . . . suffered bruises to her eyes and to her neck . . . , her left wrist was fractured and there was evidence that she . . . suffered a blow to the head." Id. at 148-149. The farmer found his mother lying naked on the defendant's bed. Id. at 148. Her hip had been fractured during the sexual assault. Id. at 149. She had hip replacement surgery, but contracted pneumonia and died three weeks after the rape. Id. The court affirmed the defendant's conviction of felony-murder in the first degree with aggravated rape as the predicate felony. Id. at 147-148. The court also determined that there was no basis on which to grant relief under G. L. c. 278, § 33E, for this "brutal attack on a

vulnerable, older woman." Id. at 155.[2,3]

On March 28, 1980, William Griffith spent the evening smoking marijuana, ingesting cocaine, and drinking alcohol. Commonwealth v. Griffith, 404 Mass. 256, 258 (1989). Thereafter, he announced that he was going to rob a convenience store located about a block away. Id. Griffith waited for the

---

[2] The court's decision in Commonwealth v. Wade, 428 Mass. 147, 147-149 (1998), supports the position that a rapist whose actions result in death, regardless of whether the death is intended, is sufficiently blameworthy for the imposition of felony-murder liability due to the depraved nature of this crime.

> "To compel another by force to acquiesce in the violation of an important right is to express contempt for a victim's autonomy and status by asserting mastery over him or her. The death of a victim under the offender's dominion and as a result of the offender's coercion, typifies the wrongfulness of assuming power over another's fate in order to wrong her. Felony murder rules appropriately impose liability for negligently causing death for a very depraved motive, as long as the predicate felony involves coercion or destruction, and a felonious purpose independent of the fatal injury. In evaluating the offender's motives, felony murder rules are compatible with other rules of American criminal law . . . ."

Binder, The Culpability of Felony Murder, 83 Notre Dame L. Rev. 965, 1059-1060 (2008) (Binder).

[3] According to Chief Justice Gants's concurrence, the factual scenarios discussed above, in which the victim was killed in the course of a sexual assault, would result in a conviction of murder. This is a misreading of the fact patterns. The rapist described in the hypothetical is intent on one "selfish aim[]," and does not recognize the obvious risks that his conduct imposes on the victim. Binder I, supra at 966. Similarly, Robert Wade's intent was to abduct and rape the elderly victim; he dragged her out of the farmhouse and beat her to accomplish this purpose. She died weeks later due to medical complications. Wade, 428 Mass. at 147-149.

store to empty of customers, and entered armed with a revolver. Id. He demanded money from the victim at gunpoint. Id. The victim managed to slip away during a chaotic moment when his wife confronted Griffith. Id. The victim then emerged from a back room armed with a baseball bat, and struck Griffith on the shoulder, head, and arm. Id. During this confrontation, Griffith accidently shot the victim in the head. Id. The defendant was convicted of felony-murder, and the court concluded that his claim that the shooting was an accident did not absolve him of liability. Id. 257, 260-261. "A defendant who kills a victim in the commission or attempted commission of a robbery, while the defendant is armed with a gun, is guilty of murder by application of the felony-murder rule. . . . The fact that, according to the defendant, the gun was discharged accidently is of no consequence." Id. at 261, quoting Commonwealth v. Evans, 390 Mass. 144, 151-152 (1983). See Commonwealth v. Neves, 474 Mass. 355, 371 (2016) (defendant convicted of felony-murder in death of taxicab driver notwithstanding defendant's claim that gun discharged accidently when victim accelerated and grabbed his hand).

The second issue raised in Chief Justice Gants's concurrence involves the imposition of vicarious criminal liability for every act committed by an accomplice, in furtherance of the felony, that results in death. See

Commonwealth v. Tejeda, 473 Mass. 269, 276 (2015). Under this reformulation of felony-murder, an accomplice would be liable for a death resulting from the commission of a felony only if the Commonwealth were able to prove that he or she shared the intent of a joint venturer who acted with malice.

Chief Justice Gants's concurrence repudiates the court's recent decision in Commonwealth v. Hanright, 466 Mass. 303, 310 (2013). In that case, the nineteen year old defendant participated in a masked armed robbery of a department store by an acquaintance, Domenic Cinelli. Id. at 304-305. The defendant, who was unarmed, walked to the store with Cinelli, and waited outside while Cinelli entered. Id. at 306. He told the police that he did not act as a lookout. Id. He claimed that he merely went along because he was afraid of Cinelli, and because he hoped to share in some of the proceeds from the robbery. Id. Responding to a report of a robbery in progress, police observed the defendant standing outside, but focused on Cinelli, who left the store carrying a duffle bag. Id. Cinelli pointed a gun at the first responding officer, a chase ensued, and Cinelli fatally shot one of the officers. Id. The defendant had walked away from the store during the pursuit, and was not involved in the subsequent confrontation. Id.

Addressing joint venture liability for escape-related crimes, the court stated, "To establish liability for felony-

murder on a theory of joint venture the Commonwealth must prove 'that a homicide occurred in the commission or attempted commission of that felony[.]  [C]omplicity in the underlying felony is sufficient to establish guilt of murder in the first or second degree if the homicide . . . <u>followed naturally and probably</u> from the carrying out of the joint enterprise'" (emphasis in original; citation omitted).  <u>Id</u>. at 307.  Recognizing that "the felony-murder rule operates according to a unique set of principles," the court concluded that the felony-murder doctrine allowed a jury to find the defendant liable for the police officer's death by virtue of his complicity in the underlying armed robbery.  <u>Id</u>. at 308-309.  Thus, the jury were not required to find that the defendant specifically intended to harm the officer.  <u>Id</u>.  See <u>Commonwealth</u> v. <u>Devereaux</u>, 256 Mass. 387, 392 (1926) ("it is no defence for the associates engaged with others in the commission of a robbery, that they did not intend to take life in its perpetration, or that they forbade their companions to kill").

The conclusion reached by Chief Justice Gants is that revision of the common-law felony-murder rule is necessary to vanquish the "fiction of constructive malice," and yield "verdicts that are just and fair in light of the defendant's criminal conduct."  See <u>ante</u> at    .  Yet, under this narrowed version of felony-murder, the defendant in this case likely

would be convicted of murder in the first degree on the basis of his joint participation in an act of third prong malice.

Chief Justice Gants describes joint venture felony-murder liability as follows: "a defendant who commits an armed robbery as a joint venturer will be found guilty of murder where a killing was committed in the course of that robbery if he or she knowingly participated in the killing with the intent required to commit it -- that is, with the intent either to kill, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result." Ante at     .

Here, the Commonwealth established that the defendant knowingly participated in the killing by supplying an accomplice with a loaded .380 handgun and other accomplices with hooded sweatshirts to be used to conceal their identities. See Commonwealth v. Zanetti, 454 Mass. 449, 470 (2009) (Appendix) (knowing participation includes aid or assistance in committing the crime). The evidence also would support a reasonable inference that the defendant had or shared the intent to carry out the crime of armed home invasion or armed robbery. The defendant supplied the handgun and disguises knowing that his accomplices were planning to enter an occupied residence at night to rob two large men, both drug dealers, at gunpoint. In

Commonwealth v. Selby, 426 Mass. 168, 172 (1997), the court concluded that a jury could infer third-prong malice from evidence that an individual entered an occupied house, carrying a loaded firearm, with the intent to commit a robbery. See Commonwealth v. Childs, 445 Mass. 529, 533 (2005) (act of cocking and pointing loaded gun at three people creates plain and strong likelihood of death to one of them).

In Commonwealth v. Rolon, 438 Mass. 808, 824 (2003), the court noted that "the doctrines of felony-murder and joint venture may, on some hypothetical fact patterns, produce a conviction of murder in the first degree that would appear out of proportion to a defendant's culpability." The reasonable and far simpler remedy to the problem of a disproportionate conviction of murder in the first degree is to exercise the court's statutory authority under G. L. c. 278, § 33E, to reduce the verdict in those extraordinary cases not consonant with justice. See Zanetti, 454 Mass. at 466 ("All of this . . . might be tolerable if there were no reasonable alternative, but there is a reasonable, and far simpler, alternative . . ."). As Chief Justice Gants's concurrence points out, this is the first time that the court has exercised its authority under G. L. c. 278, § 33E, to reduce a conviction of felony-murder in the first degree in similar circumstances. See ante at    .

Thus, rather than abolish common-law felony-murder, Chief

Justice Gants's concurrence offers a muddled version of the same crime. In the future, felony-murder liability will hinge on fine gradations between third-prong malice, wanton and reckless involuntary manslaughter, negligence, and accident -- with predictably unpredictable results. See Crump, supra at 372 (discussing disparity in verdicts created by ambiguous felony-murder rule). To be sure, there will be instances where morally culpable individuals will not be held responsible for the death of a rape victim, gasoline station attendant, or convenience store clerk. Rather than create such confusion, I would, instead, rely on the existing mechanism under G. L. c. 278, § 33E, to remedy those rare cases, such as the one presented here, where a verdict is not consonant with the interests of justice. In my view, the abrogation of common-law felony-murder to address the perceived unfairness of this conviction, at the expense of innocent victims of violent crime, is not necessary.